**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BLUEFIELD DIVISION**

**EMMETT CASEY, JR.,**
**and CONNIE Z. GILBERT,**
on behalf of themselves and others similarly situated,

       **Plaintiffs,**

v.                                    **CIVIL ACTION NO.**  <u>1:17-cv-03861</u>

**CONSOL ENERGY, INC.,**
**CONSOLIDATION COAL CO.,**
**CONSOL BUCHANAN MINING CO. LLC,**
**and KURT SALVATORI,**

       **Defendants.**

<u>**COMPLAINT**</u>

1.    This case arises out of the Defendants' breach of their fiduciary duties, material misrepresentations, and impermissible termination of critical welfare benefits for a class of retired non-union coal miners. Plaintiffs Emmet Casey Jr. and Connie Z. Gilbert, plan participants, bring this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Sec. 1001, et seq., to enjoin CONSOL Energy, Inc., Consolidation Coal Co., and CONSOL Buchanan Mining Co., LLC, (collectively, "Consol") and Kurt Salvatori, from terminating or withholding welfare benefits that Defendants offered and that their employees had accepted, to remedy the Defendants' breach of their fiduciary duty, and to prevent Defendants from discriminating against retired miners based on their health status or claims experience.

       Plaintiffs Casey and Gilbert, as well as other similarly-situated plan participants and beneficiaries, are entitled to continue receiving retirement welfare benefits (i.e. medical, prescription drug, dental, vision, and life insurance) under the applicable benefits plans because the Defendants offered lifetime retirement welfare benefits if the Plaintiffs worked for at least ten

years of credited service and reached the age of fifty-five. The Plaintiffs accepted that offer by working the requisite years and reaching age fifty-five, and they paid premiums to the Defendants in order to secure those benefits.

Plaintiffs seek declaratory, injunctive, and equitable relief, as appropriate, reinstating their benefits and remedying the breach of fiduciary duty, as well as restitution to provide Plaintiffs with the same lump sum transition payment that the Defendants provided to active (non-retired) employees when they terminated the retiree benefits.

2. The Defendants established a group welfare benefits plan, referred to as the "Lifetime Plan," which covered both active and retired workers at the subsidiaries and entities controlled by Defendant CONSOL Energy. The Defendants contractually entered into that group welfare benefits plan with the workforce, including with the Plaintiffs, based on the written and oral representations that the Defendants made to the Plaintiffs prior to their retirement.

3. The first welfare plan at issue in this matter, which is known as the Lifetime Plan, was also periodically referred to by Defendants as being either part of or related to the CONSOL Energy Inc. Retiree Health and Welfare Plan, CONSOL Energy Inc. Health and Welfare Plan, and/or the Consolidation Coal Company Comprehensive Medical Expense Benefits Plan For Production And Maintenance Employees of Buchanan Mine. This plan included medical, prescription drug, dental, vision, and life insurance for participants and certain dependents.

4. The second welfare plan at issue in this matter, which is known as the Retiree Plan, was also typically referred to by the Defendants as the CONSOL Energy Inc. Retiree Health and Welfare Plan.

5. In 2014, the Defendants substantially modified the Lifetime and the Retiree Plans, causing a curtailment of coverage for plan participants, including the Plaintiffs.

2

6.      In 2015, the Defendants terminated coverage of all retirees under the Lifetime and the Retiree Plans. In curtailing and terminating the plans, Defendants allocated the plans' assets for the benefit of persons other than the plan participants and beneficiaries – and the Defendants provided transition payments only to the plan participants who were still young and healthy enough to be actively working, whereas the Defendants did not provide such transition payments to those plan participants who had lengthier claims experience and/or were older than the active workers. Each of those actions separately violate of ERISA, as set forth in more detail below.

## JURISDICTION AND VENUE

7.      Jurisdiction over Plaintiffs' ERISA claims is founded on the existence of a federal question.  This action arises under ERISA, 29 U.S.C. § 1001, *et seq*., and jurisdiction is conferred pursuant to 29 U.S.C. § 1132.

8.      Venue is proper in this District and Division pursuant to ERISA, 29 U.S.C. § 1132(e)(2), because this District is where Plaintiff Casey resides and where a significant portion of the pertinent actions took place.

## PARTIES

9.      Plaintiff Emmett Casey is a resident of Bluefield, West Virginia.

10.      Plaintiff Connie Gilbert is a resident of Richlands, Virginia.

11.      Over 900 similarly-situated, non-union retirees of CONSOL Energy, Inc.'s operations in and around the Buchanan Mine and nearby facilities in southwestern Virginia and southern West Virginia, had their healthcare benefits terminated by the Defendants in a similar fashion as did the named Plaintiffs.

12.     Beginning in or around 2001 and thereafter at all relevant times, Defendant CONSOL Energy, Inc. was a Delaware corporation with its principal place of business located at 1000 CONSOL Energy Drive Canonsburg, Pennsylvania 15317.

13.     At all relevant times, Defendant Consolidation Coal Company ("Consolidation Coal") was a Delaware corporation with its principal place of business located at 1000 CONSOL Energy Drive Canonsburg, Pennsylvania 15317.

14.     At all relevant times, Consolidation Coal Co. and Consol Buchanan Mining Co., LLC were wholly-owned subsidiaries of CONSOL Energy, were incorporated in the State of Delaware, and maintained their principal place of business in or around Oakwood, Virginia.

15.     Defendant Kurt Salvatori was at all relevant times designated as the administrator of all of the employee welfare benefit plans at issue in this matter, exercised final judgment on behalf of those plans as their administrator, and conducted business at 1000 CONSOL Energy Drive, Canonsburg, Pennsylvania 15317.

16.     At all relevant times, Defendants operated the Buchanan Mine in Buchanan County, Virginia, at which the Plaintiffs were employed, and Defendants also jointly controlled certain other known and unknown non-union employees at operations in Virginia and West Virginia.

## STATEMENT OF FACTS

17.     When CONSOL hired new non-union employees, the company often held a multi-day orientation session in which CONSOL's representatives explained the benefits of employment, including a written and oral recitation of CONSOL's promise to provide lifetime retirement medical and prescription drug benefit coverage for miners and their spouses.

18.     In those orientation sessions, and in periodic meetings subsequently during the course of the Plaintiffs' employment with CONSOL, CONSOL's representatives stated that the

employees' lifetime retirement welfare benefit coverage would continue to be the same type of coverage that they were receiving as active workers.

19.    CONSOL described the Lifetime Plan to its non-union employees in writing: "This is a better deal than the UMWA negotiated in the national contract. AND REMEMBER, IT DIDN'T COST YOU A PENNY IN DUES OR ASSESSMENTS." CONSOL also made representations of this nature orally to Plaintiffs.

20.    The Defendants' written and oral promises of lifetime medical and prescription drug benefits, and related dental, vision, and life insurance benefits, constituted a welfare plan enforceable under ERISA (the "Lifetime Plan").

21.    The terms of the Lifetime Plan consisted of the promise that, after reaching age fifty-five and accruing ten years of service to Defendants, the Plaintiffs would continue to receive the same or similar benefits that they received, and paid in to support, as active workers. These benefits included approximately $2,500.00 in cash per year, which was available to each of the Lifetime Plan participants as a spending account to cover their deductibles or copayments, and for similar purposes.

22.    During the Plaintiffs' years as active employees for the Defendants, the Defendants withheld portions of the Plaintiffs' wages as premiums to cover the costs of the Lifetime Plan, and/or set aside accrued revenues from the production and sale of coal, to self-insure for the cost of the Lifetime Plan.

23.    During their retirement, the Plaintiffs paid premiums to the Defendants in order to receive the medical and prescription drug benefits under the Lifetime Plan.

24.    On or about September 30, 2014, the Defendants including Kurt Salvatori notified the workforce and retirees from the operations associated with Defendant Consol Buchanan

Mining Co., LLC, including the operation known as the Buchanan Mine, that employees who retired after October 1, 2014 would cease receiving retirement benefits by no later than December 31, 2019.

25.    However, on or about June 30, 2015, CONSOL wrote to the Plaintiffs to inform them that the Lifetime Plan would be terminating on December 31, 2015 rather than by December 31, 2019.

26.    When CONSOL informed the retirees of the 2014 curtailment of the Lifetime Plan, it offered a cash transition to the active workers whose benefits had already vested under the Lifetime Plan, in order to compensate them for the loss of lifetime benefits caused by the curtailment.

27.    However, CONSOL did not offer any sort of cash transition payment to the workers who had already retired prior to October 1, 2014 – and whose claims experiences were thus generally longer and costlier than those of the active workers, and who were generally more advanced in age relative to the active workers.

***Connie Gilbert accepted the offer of lifetime welfare benefits that Consol extended to the Production and Maintenance employees of Consolidation Coal Company, and its affiliates, at the Buchanan Mine and related facilities.***

28.    Ms. Gilbert began working for Island Creek Coal Company at the VP3 Mine in Vansant, Virginia in 1978, which was a union operation, and she was laid off from that site in 1982.

29.    In 1994, Ms. Gilbert exercised her "panel rights" through the union to go to work for Consolidation Coal Company at the VP3 Mine in Vansant, Virginia.  She worked there until 1997, and then went on the union seniority panel in non-working status.

30.    In 2005, CONSOL Energy called Ms. Gilbert off the panel to go to work at the non-union Buchanan Mine, where the Defendants nonetheless recognized the union seniority panel from VP3 despite Buchanan being a non-union operation at that time.

31.    The non-union, non-management employees of the Defendants are known as "Production & Maintenance" or "P&M" employees.

32.    When Ms. Gilbert went to work at the Buchanan Mine, CONSOL's representative Terry Mason gave an orientation to Ms. Gilbert, along with about ten other new miners, in the upstairs office at the Buchanan Mine.  At that orientation, Mr. Mason handed out materials regarding the insurance benefits for the P&M workers at Buchanan.  Mr. Mason stated that if the miners worked for ten years and reached age fifty-five, they would receive retirement benefits for their lives and the lives of their spouses.

33.    At that orientation, Mr. Mason gave the new hires CONSOL's customary "union speech," saying that the miners should not join the union because they could represent themselves without a union and their retirement benefits would be better than union retirements benefits, which most notably included a Congressionally-backed guarantee of lifetime duration.

34.    When miners were approaching the age of fifty-five (55) years of age, CONSOL customarily sent them a letter in the mail notifying them about their right at that time, as participants in the insurance plan providing retirement insurance benefits (the Lifetime Plan), to attend a seminar free of charge to provide comprehensive information about the retirement benefits.

35.    On or about September 26-27, 2006, having received such a letter, Connie and her husband Dana went to a retirement seminar in or around Pittsburgh, Pennsylvania to learn about their rights as participants in the retirement plan.  CONSOL did not distribute to Connie any

additional binders or other thick documents regarding retirement benefits, such as a summary plan description, either at that seminar or afterwards.

36.    CONSOL made pre-tax deductions from each of Ms. Gilbert's paychecks throughout her working life, which upon information and belief supported the CONSOL benefits self-insurance fund that also secured the retirement benefits.

37.    On September 30, 2014, Ms. Gilbert retired from CONSOL. By that time, she had attained the necessary age to retire under the Lifetime Plan.

38.    On June 16, 2015, CONSOL sent Ms. Gilbert a letter stating that her retirement benefits would terminate at the end of 2015.  In Sept. 2015, CONSOL sent Ms. Gilbert a letter purporting to offer her a payment to compensate her fully for the loss of her retirement benefits.

***Emmett Casey accepted CONSOL's offer of lifetime retirement benefits for supervisory employees of Consolidation Coal Company, and its affiliates, at the Buchanan Mine and related facilities.***

39.    On or about January 22, 1973, Mr. Emmett Casey began employment for Consolidation Coal Company through the Bishop Coal Company at Bishop, West Virginia. Mr. Casey worked as a general laborer and a union member for three years, running production equipment at the face of the mine. After three years, Mr. Casey was offered a job as section foreman – a salaried position involved in the production of coal underground.

40.    On or about February 1, 1976, CONSOL called all the prospective foreman trainees, including Mr. Casey, to a class at a restaurant in Bluewell.  A personnel official from CONSOL, named Ray Phillips, conducted an orientation about the guidelines and benefits of becoming a salaried employee.

41.    At the time that Mr. Casey considered becoming salaried, the union was engaging in strikes frequently.  Mr. Casey had saved up a substantial sum of money, and then had to spend

everything he had saved to cover his bills during the strike.  CONSOL told him that he would have a lower wage but would have benefits by working for the company.

42.     On or about February 1, 1976, CONSOL called Mr. Casey to attend a foreman's class.  The class took place at the old Crane Creek School in Crystal, West Virginia. The instructors were CONSOL employees Jim Jones, Archie Maynard, and Gerald Nicholson, who worked out of CONSOL's Pocahontas, Virginia main office.  The training was six weeks in length.  CONSOL paid Mr. Casey to attend the training for eight hours per day.  CONSOL executives spoke to Mr. Casey and the other trainees about coming to work as foremen, including a detailed description of retirement benefits.

43.     During that training, CONSOL officials represented that, once you retired as a non-union foreman, you would have lifetime welfare benefits, a pension check, and various other benefits.

44.     During the training, CONSOL offered supervisors that they could always return to serving as hourly employees in union operations if they were unsatisfied with their benefits as supervisors.

45.     Mr. Casey repeatedly viewed written materials presented by CONSOL that offered Mr. Casey and the other non-union foreman a lifelong retirement healthcare and related benefit package including medical, prescription drug, vision, dental, and life insurance.

46.     Archie Maynard, who was the head of the safety and industrial relations departments during the time that Mr. Casey worked for Pochatonas Fuel Division of CONSOL, presented a slide show to Mr. Casey and other foreman regarding that offer of lifetime welfare benefits.  Anne Sharpenberger, along with other CONSOL officials, also presented a benefit class for the salaried

employees at the Bishop Mine that Mr. Casey attended, in which the non-union foremen were invited to designate beneficiaries for their lifetime welfare benefit plans.

47.    From 1976 through 1991, Mr. Casey worked as a non-union foreman for various CONSOL operations including: Pocahontas Fuel, Bishop Mine, Rowland No. 9, Jekinjones, Itmann No. 2, Matthews No. 2 Mine, and Amonate.

48.    After CONSOL closed down the section of the Amonate Mine where Mr. Caser worked in late 1991, CONSOL transferred Mr. Casey to the Buchanan Mine where he worked for the following twenty years.

49.    On or about April 19, 1992 Mr. Casey began working as an hourly employee underground producing coal.  He held that job until November 1, 1992 when he began to serve as a salaried production foreman at the Buchanan Mine.

50.    Throughout Mr. Casey's working life, CONSOL made annual presentations stating that he was entitled to the retirement benefits for him and his family until he passed away, including slide shows and presentations by senior CONSOL officials such as chief executive officers Brett Harvey or Bobby Brown. Gerald Kowzan, Nancy Johnson, and Gene Bailey would assist in making presentations, reading the written slides shows and printed materials out loud to Mr. Casey and his fellow workers, and answering questions from those workers under the apparent authority of CONSOL.

51.    CONSOL uniformly explained to Mr. Casey and other non-union workers that, as a non-union foreman or a non-union hourly worker, a miner's spouse would have retirement benefits until the spouse passed away or remarried. Children who were at home or in college would have healthcare up to age 26 or employed by a company that offered them insurance.  In all explanations

provided Mr. Casey and other non-union workers, CONSOL never represented that benefits were subject to being eliminated.

52.    During the annual trainings, CONSOL stated that it cared an immense amount for its workers and that any changes to the policy would be made in the best interest of the beneficiaries.

53.    CONSOL made several changes to their benefits plans over the years, but never once did CONSOL indicate that the lifetime benefits eligibility could be rescinded after a worker had accepted the offer and the eligibility had vested.

54.    On February 1, 2013, Mr. Casey retired from CONSOL.  By that time, he had attained the necessary age to retire under the Lifetime Plan.

***Employees' common acceptance of CONSOL's lifetime welfare benefits offer.***

55.    Defendants' officials and agents made material misstatements about their offer of lifetime welfare benefits at the Buchanan Mine and related facilities.

56.    In response to those material misstatements, the Plaintiffs and putative class worked for the Defendants until they reached the age and tenure that CONSOL had represented would make them eligible for lifetime welfare benefits.

57.    These offers and promises of lifetime welfare benefits induced many employees of the Defendants, and of their affiliated employers, to forego wage increases within the company, to retire earlier and thus not exercise their rights to receive certain benefits under the Employee Plan, or to reject other more lucrative job opportunities.

58.    These promises of lifetime benefits induced the employees of the Defendants, and of their affiliated employers, to work for Defendants until they became eligible for retirement – a

process that the Defendants told the workers required at least ten years of service to the Defendants and the attainment of age fifty-five.

59.     These promises of lifetime welfare benefits constituted a welfare benefits plan enforceable under ERISA (referenced herein as the "Lifetime Plan").

60.     Employees, including Plaintiffs, were not provided with a copy of an SPD that outlined the retirement welfare benefits (a "Retirement SPD")---if at all---until years after they became participants in the Lifetime Plan and/or the Retiree Plan, i.e. after they reached retirement age.

61.     At no point before they became eligible for retirement were employees provided with the information or resources necessary to access the Retirement SPD.  Defendants' employees were unable to access the retirement SPD or the Retirement Plan until after they reached fifty-five and had worked at least ten years with Defendants.

62.     The Defendants withheld the Retirement SPD from the Plaintiffs when they first became participants in it during the course of their employment.  The Retirement SPD was first provided to employees only once they had become eligible to exercise their early retirement under the Retiree Plan.  The Retirement SPD included language purporting to reserve the right for the Defendants to terminate the CONSOL Energy, Inc. Retiree Medical and Prescription Drug Expense Benefits Plan (the "Retiree Plan") at any time, with or without cause, contrary to the representations made previously by Defendants to their employees, including the Plaintiffs, regarding the Lifetime Plan.

63.     The Retiree Plan constituted a separate and distinct plan, unaffiliated with the Lifetime Plan.

12

64.    Through their fraudulent concealment of the terms of the Retiree Plan and their regular, repeated, and material misrepresentations about the lifetime nature of benefits under the Retiree Plan, Defendants offered the Lifetime Plan to their non-union foreman and hourly employees in order to get those individuals to accept lower wages, discontinue labor organizing efforts, continue working for Defendants for many years, and finally to retire earlier than they otherwise might have.

65.    Plaintiffs learned after their retirement that Defendants maintained the Employee Plan and the Retiree Plan as two distinct plans, as evidenced by promulgating two different SPDs, representing that the two plans had differing eligibility requirements, and calling the plans by different names.

66.    When identifying plans under ERISA, the Department of Labor has established that each distinct plan is required to have its own unique plan number.

67.    Despite Defendants' representations to employees that the Employee Plan and Retiree Plan were distinct, the SPDs for those plans shared a common plan number, 581 or 529.

68.    Despite the Defendants maintaining separate Employee and Retiree Plans, the Defendants in fact represented those plans to the workforce – and contractually entered into them with the workforce, including with the Plaintiff – on the basis that they were a single, unified employee welfare benefits plan (the "Lifetime Plan") based on the written and oral representations that the Defendants made to the Plaintiffs prior to their retirement.

69.    The Defendants understood that distinct employee welfare benefit plans should be uniquely and separately identified by distinct Plan Numbers.

70.    Yet, the SPD and the Retirement SPD – the plan documents that were actually shared with the beneficiaries – all shared the same Plan Number (581), the same Plan

Administrator, the same effective start date of January 1, 2006, and the same underlying healthcare benefits.

71.     The Defendants' use of the same Plan Number, Plan Administrator, and effective start date in both the SPD and the Retirement SPD further indicated that the Defendants were not offering distinct plans, but rather a single Lifetime Plan – promising lifetime healthcare benefits, which could not be terminated after retirement, i.e. after vesting – that included additional unwritten promises and that had already been offered and accepted prior to the Plaintiffs' retirement.

72.     If the Defendants intended that the Employee and Retiree Plans were to operate as distinct plans, they misrepresented that intention by the aforementioned conduct.

73.      In misrepresenting the relationship between the Employee Plan, the Lifetime Plan, and the Retiree Plan, Defendants fraudulently misrepresented the terms, eligibility requirements, and rights and obligations included within the Lifetime Plan that had already been offered to and accepted by employees and retirees, including the Plaintiffs, prior to the presentation of the Retiree SPD.

74.     Upon information and belief, the above misrepresentations offered significant potential for financial gain to Defendants. By offering incomplete, inaccurate, and misleading disclosures, Defendants were able to induce employees to reject unionization, accept lower wages, continue working for Defendants, and elect to hasten the commencement of their retirement, in reliance on the promise of lifetime benefits, all of which redounded to the Defendants' financial advantage.

75.     In the fall of 2014, the Defendants informed retirees – that is, the elderly subset of the individuals who were covered under the Lifetime Plan – that their healthcare benefits would

be terminated no later than December 31, 2019. This change eliminated all or substantially all of the benefits available to those retirees under the Plan in outlying years after 2019, and upon information and belief it decreased the contribution rate required of the Defendants to maintain the residual benefits plans.

76.    Indeed, the records maintained by the Department of Labor indicate that as many as 12,000 miners lost the healthcare benefits that they were receiving from the Defendants under the Lifetime Plan and related plans during 2014 alone.

77.    In or around June of 2015, the Defendants contacted retirees, including the Plaintiffs, to inform them that their healthcare benefits would be terminated on December 31st, 2015.

78.    The Defendants did not simply terminate the benefits of all active non-union employees in this same manner. Instead, the Defendants allowed those active employees to choose between two options.  First, they could retire and continue receiving the same benefits for five years.  Second, they could continue working and receive a lump sum payout from Defendants in lieu of further benefits.

79.    For workers with between ten and twenty years of service to the Defendants, the lump sum payout made available to each worker was $25,000.  For workers with twenty or more years of such service, the lump sum payout was $50,000.

80.    Defendants did not offer retired employees the opportunity to accept such lump sum payouts when the Defendants cancelled their benefits.

81.    Over 2,000 non-union, retired employees – and perhaps as many as 12,000 – were affected by Defendants' unlawful termination of benefits.

82.     The class seeking relief consists of all of the non-union, retired employees of Defendants CONSOL Energy, Consolidation Coal Co., CONSOL Buchanan Mining Co., LLC, and of any other CONSOL subsidiaries that operated or employed individuals in McDowell or Mercer Counties, West Virginia, or Buchanan or Tazewell Counties, Virginia, or contiguous counties, whose retiree welfare benefits were terminated as described herein.

83.     At all relevant times, CONSOL Energy Inc. has been the Plan Sponsor of the Lifetime Plan, within the meaning of ERISA, 29 U.S.C. § 1002(16)(b) because it has been so designated in the governing plan instruments.

84.     At all relevant times, the Vice President of Human Resources at CONSOL has been the Plan Administrator of the Lifetime Plan within the meaning of ERISA, 29 U.S.C. § 1002(16)(a), because he has been so designated in the governing plan instruments.

85.     Plaintiffs are entitled to bring this civil action to restore their healthcare benefits, to enjoin any act or practice which violates any provision of ERISA or the terms of the Plan, to disgorge the financial benefits of the Defendants' breach of their fiduciary duty, to disgorge the profits therefrom, and/or to obtain other appropriate equitable relief.  *See* 29 U.S.C. § 1132(a)(1), (2), (3).

## CLASS ALLEGATIONS

86.     Plaintiffs bring this action on their own behalf and on behalf of all other similarly situated individuals, pursuant to Rule 23 of the *Federal Rules of Civil Procedure*. The class consists of all non-union retirees from CONSOL Energy, and its subsidiaries and affiliated entities, whose healthcare benefits were curtailed or terminated in 2014 or 2015.

87.     The requirements of Rule 23 are satisfied as follows:

(a)    The class is numerous, with over 900 members, and joinder is impracticable due to the high number of plaintiffs, which would frustrate the coordination of multi-plaintiff litigation involving so many affected individuals;

(b)    There are questions of law and fact common to all members of the class, which predominate over any questions affecting only individual members, regarding the ERISA plans and the facts surrounding the entry of those plans and the conditions of their curtailment or termination; and

(c)    The named Plaintiffs' claims are typical of those of the class as a whole because the named Plaintiffs were subject to the same curtailments and terminations, and were injured as a result, in the same manner as were the rest of the putative class members.

88.    The Plaintiffs have displayed an interest in vindicating the rights of the class members, will fairly and adequately protect and represent the interests of the class, and are represented by skillful and knowledgeable counsel. The relief sought by the named Plaintiffs will inure to the benefit of the class generally.

### FIRST CAUSE OF ACTION
**Breach of Fiduciary Duty**
**29 U.S.C. § 1104(a)(1)(a)(i)**

1.    Plaintiffs incorporate the preceding paragraphs by reference.

2.    At all relevant times, Defendants were fiduciaries to the Lifetime Plan as defined in 29 U.S.C. § 1002(21).

3.    The Defendants are fiduciaries with respect to the terms of enrollment and the scope of benefits in the Lifetime Plan because they exerted control or authority over the management, administration, and/or disposition of the terms or assets of that plan, and because they appointed

other fiduciaries, including Gerald Kowzan, Chase Elswick, Craig Campbell, and other salaried employees to exert control with respect to those same terms.

4.     29 U.S.C. § 1104(a)(1) requires that a fiduciary must discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan.

5.     In choosing to release inaccurate SPDs to employees and retirees, misrepresenting the lifetime nature of retiree welfare benefits, and not abiding by the terms of the controlling ERISA plan, Defendants induced participants to make choices that were financially valuable for Defendants to the participants' detriment.

6.     When the Defendants represented to the Plaintiffs that the Lifetime Plan would provide welfare benefits for the lifetimes of the Plaintiffs and their dependents, the Defendants misrepresented the Lifetime Plan.

7.      When the Defendants accepted the Plaintiffs' continued employment in exchange for the promise to provide the Lifetime Plan, the Defendants fraudulently induced the Plaintiffs into accepting the Lifetime Plan.

8.     When the Defendants accepted premiums from the Plaintiffs as consideration for enrollment in the plan on the basis of the promise of lifetime welfare benefits, the Defendants became bound by their promise to provide lifetime welfare benefits.

9.     Defendants thus violated ERISA, 29 U.S.C. § 1104(a)(1) by breaching their fiduciary duties when they took action to increase revenue for the corporate sponsor of the plan by misrepresenting the benefits to the plan beneficiaries – thus acting not exclusively for the purpose of providing benefits to participants and their beneficiaries.

## SECOND CAUSE OF ACTION
### Enforcement of the ERISA Plan Entered into by Defendants' Representations
### 29 U.S.C. 1132(a)(1), (2), and (3)

10.     Plaintiffs incorporate the preceding paragraphs by reference.

11.     In the alternative, even if the Employee Plan was not part of the Lifetime Plan under ERISA, then nonetheless the Plaintiffs were still participants in an enforceable ERISA plan arising from the written representations, and consistent oral representations, made by the Defendants regarding the lifetime availability of the benefits that the Plaintiffs received in retirement – the medical, prescription drug, vision, dental, and life insurance.

12.     The Plaintiffs were not participants in the Retiree Plan at the time that Defendants, by their agents Messrs. Patterson, Elswick, and Kowzan, and others, made representations to the Plaintiffs concerning the lifetime nature of their welfare benefits, nor at the time that the Plaintiffs detrimentally relied on those representations by foregoing other job opportunities, by retiring earlier than they otherwise might have, by foregoing union representations, and so on as set forth herein.

13.     The Employee Plan expressly excluded and disclaimed any authority over the benefits provided to inactive (that is, retired) or non-full time employees, so any reservations of rights asserted in the Employee Plan, or by the SPD, could not have applied to the Lifetime Plan.

14.     Since the time that they retired, the Plaintiffs have not been active, full-time employees as defined by the Employee Plan.

15.     Oral representations to Plaintiffs concerning the lifetime nature of their welfare benefits as participants in the Lifetime Plan did not conflict with any terms of the Employee Plan (or of the Lifetime Plan), and such oral representations fell entirely outside of the scope of the Employee Plan.

16.    The Plaintiffs were not participants in any contradictory ERISA plan at the time that they relied on the Defendants' representations. Accordingly, the Defendants' representations of lifetime welfare benefits were not an amendment to any other ERISA plan to which Plaintiffs were participants, and the promise of lifetime welfare benefits created the Lifetime Plan based on the oral representations made by Defendants.  If the representations were amendments to another plan, they were not inconsistent with the terms of such other plan.  The Lifetime Plan was and remains an enforceable plan under ERISA.

17.    The terms of the Lifetime Plan entered into by Defendants are plain on their face and should be interpreted to entitle Plaintiffs to the lifetime welfare benefits which they regularly and repeatedly promised.

### THIRD CAUSE OF ACTION
### Discrimination Against Individual Participants and Beneficiaries in the Retiree Plan Based on Health Status-Related Factors
### 29 U.S.C. § 1182

18.    Plaintiffs incorporate the preceding paragraphs by reference.

19.    29 U.S.C. § 1182(a)(1) prohibits a group health plan from establishing rules for eligibility (including continued eligibility) based on health status-related factors.

20.    29 U.S.C. § 1182(b) prohibits a group health plan from requiring an individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor.

21.    Included among the prohibited health status-related factors are health status, medical condition, claims experience, receipt of healthcare, medical history, and disability.

22.    Individuals who had already retired as of September 30, 2014 necessarily had a lengthier history of filing claims under the applicable Plan, and receiving healthcare under that

Plan (i.e. a lengthier claims experience), and also tended to be less healthy due to their advanced age relative to the active workers.

23.    In deciding to terminate benefits without a cash transition payment for the individuals who had already retired as of September 30, 2014, the Defendants unlawfully established and enforced rules for eligibility for the cash transition payment under the Lifetime Plan and/or the Retiree Plan based on the health status-related factors of health status, medical condition, claims experience, receipt of healthcare, medical history, and/or disability.

24.    Defendants' establishment of rules limiting and then terminating welfare benefits only for those retired employees over the age of fifty-five – while offering no offsetting payout to those employees, as they had offered to those younger, active employees with superior health status – was based on health status. The rules were based on health status because they distinguished between those who were entitled to receive the payout and those who were not based on the retirement status of those individuals, and because those individuals who were retired were known to have a health status that was inferior to that of the other younger workers whose benefits were not terminated in the same fashion.

25.    Insofar as the Defendants provided a cash transition payment to the non-retired participants in the Lifetime Plan, but required the retired participants to continue paying larger premiums or contributions after the curtailment in 2014, the Defendants violated 29 U.S.C. § 1182(b).

26.    In establishing and enforcing rules that limited the Plaintiffs' eligibility or continued eligibility for benefits, Defendants did not comply with the requirements established in 29 U.S.C. § 1182(a)(1) and thus acted unlawfully under ERISA.

### FOURTH CAUSE OF ACTION
**Failure to Meet Duty of Disclosure with Respect to Summary Plan Descriptions**

**29 U.S.C § 1021(a)(1)**

27.     Plaintiffs incorporate the preceding paragraphs by reference.

28.     ERISA, 29 U.S.C. § 1021, requires that plan administrators provide all plan participants and beneficiaries with accurate SPDs, conforming to the requirements of 29 U.S.C. § 1022(a).

29.     29 U.S.C. § 1022(a)(1) requires that SPDs be sufficiently accurate and comprehensive to reasonably apprise participants of their rights and obligations under the plan.

30.     Defendants provided Plaintiffs with no SPDs or with incomplete SPDs for many years. Those SPDs did not mention important benefits and obligations under the Lifetime Plan.

31.     The Plaintiffs did not receive the Retiree SPD, with the additional inconsistent terms, until those Lifetime Plan participants had reached at least age fifty-five and had worked for Defendants for a minimum of ten years.

32.     By excluding information about benefits that the plan confers upon retirement, Defendants provided inaccurate and incomplete SPDs to plan participants and beneficiaries, making it impossible for them to adequately be aware of their rights and obligations under the Lifetime Plan.

33.     By failing to provide accurate or comprehensive SPDs, Defendants violated their duty of disclosure under 29 U.S.C. § 1021.

34.     Plaintiffs are entitled to bring this civil action to enjoin any act or practice which violates any provision of ERISA or the terms of the Plan, and/or to obtain other appropriate equitable relief.  *See* 29 U.S.C. § 1132(a)(3).

## FIFTH CAUSE OF ACTION
**Failure to Provide Accurate and Comprehensive Summary Plan Description
29 U.S.C § 1022(a)**

35.    Plaintiffs incorporate the preceding paragraphs by reference.

36.    Defendants' willful and unlawful distribution of inaccurate and non-comprehensive Plan descriptions violates 29 U.S.C. § 1022(a) and the SPD requirements contained therein.

37.    SPDs provided by Defendants were neither accurate nor comprehensive, as set forth in preceding paragraphs, based on the inaccurate Plan Number, and the exclusion of information about benefits that the plan confers upon retirement.

<u>SIXTH CAUSE OF ACTION</u>
**Failure to Accurately State the Plan's Requirements with Respect to Eligibility**
**29 U.S.C § 1022(b)**

38.    Plaintiffs incorporate the preceding paragraphs by reference.

39.    To the extent that the Defendants did make available an SPD to certain of the Plaintiffs and the class, the Defendants only gave the Plaintiffs a single SPD, which the Defendants represented to apply to all benefits, including for both active and retired workers.

40.    Because the text of that SPD did not address any potential limitations on the promise of lifetime benefits under the Lifetime Plan, the only terms that the Plaintiffs could rely on as to the terms, scope, or duration of the Lifetime Plan were the oral representations made by the Defendants and their agents.

41.    Accordingly, insofar as the Defendants assert that they had a right to refuse eligibility for the Lifetime Plan, the SPDs that the Defendants offered to the Plaintiffs did not accurately state those terms, in violation of 29 U.S.C § 1022(b).

42.    The text of the SPD provided to the Plaintiffs and the other putative class members stated that only active, full-time employees were eligible to receive benefits.

43.    In reality, even though the SPD did not address retirees, the Defendants' oral representations indicated that the Plaintiffs were also enrolling in the Lifetime Plan at the time that

they enrolled in the medical benefits plan as active workers, and consequently the SPD that the Plaintiffs received did not accurately state all of the plan's requirements with respect to eligibility for lifetime benefits.

44.     This misrepresentation was a violation of ERISA which prejudiced the Plaintiffs by depriving them of adequate notice of their benefits.

## SEVENTH CAUSE OF ACTION
### Failure to Provide an Adequate Summary Plan Description in a Timely Manner
### 29 U.S.C. § 1024(b)(1)

45.     Plaintiffs incorporate the preceding paragraphs by reference.

46.     ERISA at 29 U.S.C. § 1024(b)(1) requires that plan administrators and sponsors produce an accurate copy of the Summary Plan Description to plan participants and beneficiaries in a timely manner.

47.     Defendants failed to provide an accurate Summary Plan Description to plan participants and beneficiaries for many years after they were covered by the Lifetime Plan – or after they were covered by the Employee Plan and by the Retiree Plan, if they were separate plans.

48.     Because Defendants failed to provide an accurate Summary Plan Description within the required 90-day or 120-day period, they violated § 1024(b)(1) of ERISA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray the Court:

I.     Certify a class consisting of all of the non-union, retired employees of Defendants CONSOL Energy, Consolidation Coal Co., CONSOL Buchanan Mining Co., LLC, and of any other CONSOL subsidiaries that operated or employed individuals in McDowell or Mercer Counties, West Virginia, or Buchanan or Tazewell Counties, Virginia, or contiguous counties, whose retiree welfare benefits were terminated by Defendants in 2014 or 2015;

II.    Enjoin Defendants from any further violation of their ERISA fiduciary responsibilities, duties and obligations;

III.    Compel the Defendants to honor the terms of the Lifetime Plan orally entered into by Defendants, requiring Defendants to provide Plaintiffs and their beneficiaries with lifetime welfare benefits.

IV.    Order the disgorgement of the financial benefit obtained by the Defendants through their breach of their fiduciary duties, and the return of the premiums paid by Plaintiffs for retirement welfare benefits that they did not receive;

V.    Compel the Defendants to treat the retirees the same as they treated the active employees by allowing the retirees either to maintain their terminated benefits or to receive the same lump sum payouts that the Defendants' active workers could elect to receive in lieu of ongoing benefits;

VI.    Direct the Department of Labor to assess all appropriate civil penalties pursuant to 29 U.S.C. 1132, et seq., 29 C.F.R. § 2560.502c-7;

VII.    Hold that Defendants are estopped from relying on the terms of the Retiree Plan insofar as they conflict with the terms of the Lifetime Plan, due to the fact that the Plaintiffs detrimentally relied on Defendants' misrepresentations and due to Defendants' fraudulent and coercive withholding of key terms of that Retiree Plan;

VIII.    Award such other equitable or remedial relief as may be appropriate;

IX.    Award Plaintiffs and their attorney reasonable costs and attorney fees, pursuant to 29 U.S.C. § 1132(g); and

X.    Grant any such other and further relief as this Court may deem just and proper.

**Emmett Casey and Connie Gilbert**
**on behalf of themselves and all others similarly situated,**

**PLAINTIFFS,**
**BY COUNSEL,**

__/s/ Samuel B. Petsonk_____

Samuel B. Petsonk (State Bar ID No. 12418)
Bren J. Pomponio (State Bar ID No. 7774)
Mountain State Justice, Inc.
1031 Quarrier Street, Suite 200
Charleston, West Virginia 25301
(304) 344-3144
(304) 344-3145 (fax)
sam@msjlaw.org
*Counsel for Petitioners*