UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

BENNY FITZWATER, CLARENCE
BRIGHT, TERRY PRATER,
EMMET CASEY, JR., CONNIE Z.
GILBERT, ALLAN H. JACK, SR.,
and ROBERT H. LONG,

        Plaintiffs,

v.                                          Civil Action No. 2:16-cv-09849

CONSOL ENERGY, INC.,                        Consolidated with:
CONSOLIDATION COAL CO.,                     Civil Action No. 1:17-cv-03861
FOLA COAL CO., LLC,
CONSOL OF KENTUCKY, INC.,
CONSOL PENNSYLVANIA COAL CO.,
LLC, and KURT SALVATORI,

        Defendants.


<u>MEMORANDUM OPINION AND ORDER</u>


In February 2021, the court conducted a bench trial in this action. On March 12, 2021, plaintiffs Benny Fitzwater, Clarence Bright, Terry Prater, Emmet Casey, Jr., Connie Z. Gilbert, Allan H. Jack, Sr., and Robert H. Long ("plaintiffs"), filed their post-trial brief. On March 22, 2021, defendant CONSOL Energy, Inc., together with its subsidiaries, Consolidation Coal Co., Fola Coal Co., LLC, CONSOL of Kentucky, Inc., and CONSOL Pennsylvania Coal Co., LLC, (collectively "CONSOL"), and Kurt Salvatori filed their response. On March 25, 2021, plaintiffs filed their reply brief.

The plaintiffs are all retired coal miners who worked at mine sites owned by CONSOL Energy, LLC or its subsidiaries, during various times between 1969 and 2014.  Those mines include the Bailey and Enlow Fork mines in Southwestern Pennsylvania, CONSOL of Kentucky (also referred to as the Jones Fork mine) in Eastern Kentucky, the Fola mine site in Southern West Virginia, and the Buchanan mine in Southwestern Virginia.  Following summary judgment, two claims remain in this case.  ECF No. 262.

Plaintiffs' primary claim for relief is based on alleged misrepresentations made by defendants regarding the likely future of plaintiffs' retirement welfare benefits, in violation of defendants' ERISA-imposed fiduciary duties.  The retirement benefits included coverage for both the employee and his or her spouse for medical care, including hospitalization, prescription drugs, and dental and vision care, collectively referred to as "retiree medical benefits," as well as, in some cases, the option to purchase life insurance.  Those benefits were available to retirees who reached 10 years of service and age 55.  Once the employee became eligible to receive Medicare, the medical benefits became supplemental to Medicare.  Employees paid a premium for these benefits both while actively employed and when retired.

While all of the plan documents relating to plaintiffs' benefits contained a clause expressly reserving CONSOL's right to modify or terminate a participants' benefits, plaintiffs claim that representatives of CONSOL Energy, mainly its mine-site Human Resources ("HR") managers, expressly and through implication, conveyed to plaintiffs that their benefits would continue for the remainder of their lives.  All of the plan documents during the relevant time period named the Vice President of Human Resources, who served as the senior official responsible for HR functions for all of the CONSOL companies, as the named fiduciary for plan participants.

Plaintiffs' second remaining claim is that defendants failed to distribute, within the time period allotted by ERISA, 2011 Summary Plan Descriptions (SPDs) following the 2011 separation by CONSOL Energy and its subsidiaries of the retiree welfare benefits plan from the active employee benefits plan.

## I.    FINDINGS OF FACT

The court makes the following findings of fact by a preponderance of the evidence.

### A. Distribution of SPDs

Each SPD issued by CONSOL from the period 1980 until 2015 contained a reservation of rights clause, in which the company stated that it reserved the right to terminate, suspend, or amend the corresponding plan at any time and for any reason. (Trial Trans. at 877-78, 883) (hereinafter "Tr. at ____"). None of the SPDs contain express promises of lifetime medical benefits. Tr. at 882-83. Each plaintiff received SPDs by U.S. Mail during their careers and after retirement, and had copies of SPDs available to them upon request from the HR offices at the mine sites. Tr. at 889.

### B. Fiduciary Status

Defendant CONSOL Energy, Inc. is the parent company of defendants Fola Coal Co., LLC, CONSOL of Kentucky, Inc., and CONSOL Pennsylvania Coal Co., LLC. Tr. at 27. CONSOL Energy, LLC was also the parent company of defendant Consolidation Coal Co. until it was largely sold to Murray Energy at the end of 2013. Tr. at 872.

Prior to 1972, each of CONSOL's coal mining operations was a union mine, represented by the United Mine Workers of America (UMWA). Tr. at 392-93. With the opening of the Burnham operation in the Navajo Nation, CONSOL became "double-breasted," meaning it had both union and non-union operations. Tr. at 392-93.

The next non-union operation opened by CONSOL was the Buchanan mine, then called "Buchanan One," in 1983 in Southwestern Virginia. Tr. at 419, 870. Buchanan entered full production in 1986. Tr. at 870. From the time it opened until December 2013, Buchanan was an asset of Consolidation Coal Co. Tr. at 871. Buchanan remained part of CONSOL Energy as a separate subsidiary from December 2013, following sale of most of Consolidation Coal to Murray Energy, until being sold in 2015. Tr. at 871-72.

Around 1982 or 1983, Dean Michael Hymes, a senior Human Resources manager for CONSOL, was tasked with putting together a handbook and an orientation program for the Buchanan mine. Tr. at 400-02. Hymes and his direct subordinates drafted the materials pursuant to a union avoidance strategy laid out by Roger Haynes, as CONSOL Energy's Executive Vice President of HR. Tr. at 400-01, 411. As an essential part of the union-free strategy, Haynes instructed Hymes to put together a benefits

package that would be equal to or better than the United Mine Workers of America ("UMWA") package.  That included the orientation program and handbook that were designed to persuade employees not to unionize.  Tr. at 411, 419.  Thereafter, the employees were repeatedly informed that their benefits would be as good or better than those of union employees.

The Buchanan program that Hymes and his subordinates designed from 1982 through 1986 was a five-day orientation of employees from Monday to Friday at the Bluefield, Virginia regional office, and a half-day spousal orientation on Saturday morning.  Tr. at 419, 432-33.  The orientation meetings took place after employees had been offered and accepted employment and were already on the payroll.  Tr. at 433.  The length of the orientation did not change while Hymes was there.  Tr. at 434.  Part of the program was a script written for the presenter, which Hymes developed with his subordinates John Fox and Gerald Nicholson.  Tr. at 434.  The script was reviewed and approved by Haynes, as well as Senior Vice President of Mining Eustace Frederick and Ron Smith who had operating responsibilities for Buchanan.  Tr. at 434.  The program also received input from CONSOL's Manager of Employee Development, Bill Waddle, and CONSOL's Manager of Employee Compensation, George Fedlow.  Tr. at 434.

Presenters were instructed to follow the script closely at Buchanan, rather than speaking in their own words. Tr. at 508.  Hymes attended 25 orientations in 1984 and 1985 to ensure that the Supervisor of Industrial Employee Relations at Buchanan, John Fox, followed the script.  Tr. at 642.  He also presented the first orientation held at Jones Fork around 1989. Tr. at 533.

The Bailey mine in Southwestern Pennsylvania began production in 1981.  Tr. at 872.  The adjacent Enlow Fork mine began operating in 1990 or 1991, beginning full production in 1993.  Tr. at 872.  Both mines were and are owned by CONSOL Pennsylvania Coal Company, which is a wholly owned subsidiary of CONSOL Energy.  Tr. at 872-73.

CONSOL purchased mine operations and land in Eastern Kentucky at some point around 1986 or 1987 from a company called Utah International.  Tr. at 416, 873.  CONSOL of Kentucky, originally referred to as Eastern Kentucky operations, included mines in Pike County, Johnson County, Knott County, and Letcher County, Kentucky.  Tr. at 412, 414.  That acquisition included the property which would become the Jones Fork mine, as well as already operating mines and a processing plant in David, Kentucky.  Tr. at 417.  The Jones Fork mine became operational

in 1989.  Tr. at 873.  CONSOL owned the mines in Kentucky until being sold to Booth Energy in 2015.  Tr. at 873-74.

Haynes and Buck Hyler, CONSOL's Senior Vice President of Labor Relations, instructed Hymes to implement a union-free strategy at the Jones Fork mine that was substantially similar to the strategy implemented at Buchanan and at Bailey.  Tr. at 414-15; 425-26.  Hyler later succeeded Haynes as CONSOL's named fiduciary and Vice President of HR for the years 1991 to 1999.  Tr. at 929.

The union-free strategy was designed to be the same across Consolidation Coal Company by Haynes at the direction of the CEO Bobby Brown.  Tr. at 427-28.  In the 1980s and early 1990s, Craig Campbell, Terry Mason, and Luke Gianato, in their roles as Supervisors of Industrial Employee Relations at various mine sites, had responsibility for delivering and communicating about the benefits plan for employees and for delivering the union-free strategy.  Tr. at 601.

Finally, CONSOL Energy acquired a company called AMVEST in July of 2007, which included the Fola mine near Summersville, West Virginia.  Tr. at 874.  CONSOL sold Fola to Booth Energy in 2015.  Tr. at 875.  The record does not establish whether HR managers at Fola used the same or similar

union avoidance materials to those used at Buchanan, Enlow Fork, Bailey, and Jones Fork mines.

Throughout the relevant time period, the plan documents formally delegated plan administration duties to the CONSOL Energy's Vice President of HR as the named plan fiduciary. See Summ. J. Mem. Op. & Order, at 35–36. CONSOL retained the power in its plan documents to amend or terminate its benefits plans by its Board of Directors. Tr. at 866. The responsibilities of the named fiduciary of the benefits plans included administration of the plan documents, issuing Summary Plan Descriptions (SPDs), Summaries of Material Modification (SMMs), and general participant communications regarding benefits. Tr. at 865-66. At some point between 2005 and 2010, the Vice President of HR began using documents called "Benefits Enrollment Guides" to help guide active employees in choosing between plans. Tr. at 911. The Vice President of HR also utilized "Healthcare Highlights" documents periodically to summarize benefits plans for retired enrollees. Tr. at 914.

In addition to its role as named fiduciary, the Vice President of HR was responsible for all HR functions, including benefits plans, compensation, and training for each of CONSOL's companies. Tr. at 865. Each of the HR managers at the various mine sites reported to the Vice President of HR for all HR

functions.  Tr. at 946.  Kurt Salvatori, in his role as Vice President of HR from 2011 to 2016, reviewed scripts that HR managers for each of CONSOL's companies utilized to explain benefits to participants, in part by making favorable comparisons to the UMWA benefits.  Tr. at 949-50.

In practice, the named fiduciary role and the human resources role of the Vice President of HR blended together, most crucially as it related to communications with employees about their benefits.  Salvatori testified at trial that when communications "involved plan administration or training changes to the plan themselves from me, they were communications by the fiduciary. If the communications involved other items, it would be in my role as Vice President of Human Resources."  Tr. at 947.  Yet, when the mine HR managers, who reported to the Vice President of HR for HR functions, appeared at orientation meetings and union awareness meetings, they did so to discuss both plan-related and non-plan related topics.  See e.g., Tr. at 100.

The Vice Presidents of HR over the relevant time period were as follows: Roger Haynes from the early 1980s until 1991, Buck Hyler from 1991 until 1999, Karen Ziemba from 1999 until 2002, Jack Holt from 2002 until 2003, Patricia Lang from 2004 to 2007, Albert Aloia from 2008 until 2009, Michael Mclean

10

from 2010 until September 2011, and Kurt Salvatori from
September 2011 until May 2016.  Tr. at 865, 928-29.  As the plan
documents named the Vice President of HR as the fiduciary, each
of these individuals served in that role during the
corresponding time period.

The formal arrangement of the plan administration,
that is delegation of administrative functions in the plan
documents to the Vice President of HR, allowed CONSOL to
nominally relinquish fiduciary responsibilities while still
retaining substantial <u>de facto</u> control over the individual who
had those responsibilities.  The company retained the power to
hire or fire the Vice President of HR, paid his or her salary,
and controlled his or her daily employment functions.  By tying
the named fiduciary role to a position within the company rather
than an individual, COSOL ensured that the plan fiduciary would
always be an individual over whom it retained substantial
control.  No showing was made by the defendants that CONSOL
provided any safeguards against the conflict of interest
inherent in having one of its agents for day-to-day operations
act as the plan fiduciary, with the substantial ERISA-imposed
obligations owed to plan participants.  Thus, CONSOL never fully
delegated the administrative power over the plan to the named
fiduciary.

11

In December 2013, CONSOL sold its subsidiary Consolidation Coal Company, including its retiree liabilities to Murray Energy.  Tr. at 917.  Part of the contractual arrangement involved CONSOL continuing to cover retiree liabilities of the subsidiary until March 31, 2014.  Tr. at 919.  In a March 14, 2014 letter, CONSOL informed retirees affected by the sale that the responsibility for administering their plan would transfer to Murray Energy on March 31, 2014.  Tr. at 919; Pls.' Ex. 8 at MSJ 987.  On April 8, 2014, Murray Energy informed retirees that it intended to terminate benefits they assumed from CONSOL effective December 31, 2014.  Tr. at 920.  Nobody from CONSOL was involved in Murray Energy's decision to terminate retiree welfare benefits.  Tr. at 920.

In the Fall of 2014, CONSOL's Board of Directors delegated to Salvatori through a resolution the authority to modify retiree welfare plans.  Tr. at 866.  CONSOL purported to be delegating that authority to Salvatori in his role as Vice President of HR, rather than as the named fiduciary.  Tr. at 866.  In Fall of 2014, CONSOL sent letters to participants in the retiree welfare benefits plan informing them that their benefits, including medical, prescription drug, vision, dental and life insurance would terminate on December 31, 2019.  Pls.' Ex. 1.

In the Summer of 2015, the Board delegated to Salvatori the authority to terminate retiree welfare plans. Tr. at 866. On June 16, 2015, Salvatori sent a letter informing participants in the retiree welfare benefits plan that their benefits would terminate on December 31, 2015. Pls.' Ex. 2.

### C. Alleged Misrepresentations

Each plaintiff maintains that CONSOL employees working in the HR department made oral representations to the effect that, if the employees reached 55 years of age and 10 years of service, they would receive retirement benefits for life, either directly or through implication. Each plaintiff was made somewhat different representations at different times and places, and thus the court makes specific findings as to each plaintiff.

<u>Allan H. Jack</u>

Allan H. Jack worked as a mine examiner at the Enlow Fork Mine, part of the Enlow-Bailey complex in southwestern Pennsylvania. Tr. at 28-29. He was employed by CONSOL for approximately two years in the early 1970s and then again from 1991 until his retirement in December 2009. Tr. at 29. He was an hourly non-union employee. Tr. at 29. Jack testified that he could not recall whether he received a 2011 SPD. Tr. at 41.

Jack attended an initial orientation for new hires at the Enlow Fork and Bailey mines with his wife in July 1991 during which retiree welfare benefits were discussed.  Tr. at 29-30.  At the time he attended the orientation, Jack was already employed by another employer at a location 112 miles from the Enlow Fork mine in a position he described as a "good job," which paid more than the CONSOL job, but which did not offer retirement benefits.  Tr. at 30-32.  Jack testified that he specifically asked Luke Gianato, the HR manager at the Enlow Fork mine, "Are you telling me that when I retire with the 10 years and age 55, that my wife and I will have our healthcare for life? Is that what you are telling me?"  Tr. at 31.  Gianato responded "Yes. That's what it says right here," referring to a screen displaying plan details.  Tr. at 31.  This was a material misrepresentation of the likely future of Jack's retiree medical benefits.

During the orientation meeting, Gianato compared the retiree welfare benefits at Enlow Fork and Bailey favorably to the benefits plan attained for union miners by the UMWA.  Tr. at 32-33.  At that meeting, Gianato said that CONSOL employees, like UMWA miners would have a pension and medical benefits for life, as well as a 401(k), which union miners did not have, and better wages than UMWA miners.  Tr. at 32-33.  During the

14

orientation meeting, nobody from CONSOL mentioned CONSOL's
reservation of right to terminate the retiree welfare benefits.
Tr. at 30.

Jack believed that Gianato had the authority to offer
information about the benefits plan, inasmuch as Gianato had
told employees to come to him regarding questions about their
benefits. Tr. at 31-32. Jack's decision to move, terminate his
other employment, and take employment with CONSOL, was
principally motivated by the availability of lifetime retirement
benefits that Gianato described in the orientation meeting. Tr.
at 30-31, 84. In making this decision, Jack detrimentally
relied on the material misrepresentations made by Gianato.

At that orientation meeting in 1991, Jack also
received a booklet in a three-ring binder that contained a
reservation of rights to terminate the benefits, a provision
which he states that he did not read. Tr. at 57. Jack
subsequently received other documents that contained a similar
reservation that he chose to disregard as "fine print." Tr. at
51-52.

After orientation, Jack attended annual refresher
meetings where, among other things, Gianato would go over
benefits with employees and "stress that [employees] would have
healthcare for life." Tr. at 33. These statements constituted

material misrepresentations of Jack's retiree medical benefits. CONSOL did not discuss the fact that they reserved the right to terminate retiree welfare benefits during these meetings.  Tr. at 38.

Sometime around 1992 or 1993, the UMWA engaged in an aggressive campaign to get miners at the Bailey and Enlow Fork mines to unionize.  Tr. at 34.  At that time, CONSOL held several meetings with employees making further comparisons between CONSOL's and the UMWA's benefits packages, including that CONSOL employees "would always have healthcare for life" and that their "benefits would always be better than [those of] the Mine Workers."  Tr. at 34-35.  These statements constituted material misrepresentations of the likely future of Jack's retiree medical benefits.  During these meetings, nobody from CONSOL mentioned CONSOL's reservation of right to terminate retiree welfare benefits.  Tr. at 35.

Finally, Jack and his wife attended a retirement seminar approximately one to two years before his December 2009 retirement at a country club, rather than the mine site.  Tr. at 38.  It was attended by employees from multiple mine sites and was led by CONSOL corporate representatives, whose names Jack was unable to recall at trial.  Tr. at 38-40.  The corporate representatives told attendees that they would continue to have

16

medical, dental, eye, prescription drug, and life insurance coverage for life after they retired.  Tr. at 39.  This statement was a material misrepresentation of Jack's benefits. The corporate representatives did not mention CONSOL's reservation of right to terminate retiree welfare benefits.  Tr. at 41.  Jack decided after that meeting to retire in 2009 based on his understanding that he would have retiree welfare benefits for the remainder of his life.  Tr. at 41.  Jack retired in December 2009.  Tr. at 38.  By retiring earlier than he otherwise would have, Jack detrimentally relied on the misrepresentations of those corporate representatives, although it is noted that he had from time to time received CONSOL documents containing the reservation of rights clause that he chose not to read.

Jack received a letter from CONSOL in the Fall of 2014, notifying participants that their retiree welfare benefits plan would terminate on December 31, 2019.  Tr. at 42-43; Pls.' Ex. 1.  Jack believed that he would continue to receive medical benefits for the next five years.  Tr. at 42.  That letter included the reservation of rights clause, which stated that "CONSOL reserves the right to amend, modify or terminate its retiree benefits programs."  Tr. at 83.  Jack received a letter in June 2015 from Salvatori, informing plan participants that,

contrary to the 2014 letter, retiree medical benefits would terminate on December 31, 2015.  Tr. at 43; <u>see</u> Pls.' Ex. 2.

Since Jack has been on Medicare since he retired, he anticipated that CONSOL would have provided supplemental medical coverage.  Tr. at 46.  Jack has severe spinal stenosis in his neck and lower back and requires epidurals every three months.  Tr. at 44.  Additionally, he recently received a necessary hearing aid, which cost $3,500.  Tr. at 44.  His wife had a torn nerve in her jaw, which required specialized dental work, acupuncture, and Botox, costing $2,500 in 2019.  Tr. at 44.

### Robert H. Long

Robert H. Long worked for CONSOL from 1969 until 2003, when he left to work for Alpha Natural Resources, where he retired in 2009, with an interruption between 1999 and 2001.  Tr. at 284-85, 310.  He was a salaried foreman for 25 of his 33 years and was a non-union hourly employee for 2 years.  Tr. at 284-85.

Long began working for the Pittsburgh Coal Company, a division of Consolidated Coal Company in Albury, Pennsylvania in 1969.  Tr. at 286.  During a 1969 meeting with an HR representative whose name Long could not recall, Long was told that employees were eligible to receive retiree welfare

benefits, including medical, prescription drug, vision, dental, life, and disability insurance, upon reaching 55 years of age and 10 years of service.  Tr. at 288.  That individual did not mention that CONSOL reserved the right to terminate retiree welfare benefits.  Tr. at 290.

Long was given a written description of his benefit package around that time, which he reviewed.  Tr. at 290, 323. That written description contained a reservation of rights clause.  Tr. at 323.  Long received a number of written descriptions of his benefits package over the course of his career with CONSOL, each of which he reviewed and each of which he knew contained a reservation of rights clause, of which he was aware.  Tr. at 323.

In 1991, Long began working at the Enlow Fork mine in Southwestern Pennsylvania as an hourly employee.  Tr. at 291. Around the time he started at Enlow Fork, Long attended an orientation meeting for hourly non-union employees, though he knew he would become a salaried employee shortly after starting at Enlow Fork.  Tr. at 323-24.  Luke Gianato, the HR manager at Enlow Fork, presented a chart at the orientation meeting comparing CONSOL's retiree welfare benefits with those of the UMWA, including that CONSOL's plan allowed employees to retire with benefits at age 55 with 10 years of service.  Tr. at 295-

96.  Long believed that this representation meant he was
entitled to benefits for his life, though it is unclear if the
phrase "for life" was used in the presentation.  Tr. at 297,
324.  Long received a written benefits plan at his orientation
which contained a written reservation of rights clause, though
Gianato did not discuss the reservation of rights clause.  Tr.
at 294, 318.  Long acknowledged on cross-examination, that with
respect to the written descriptions of benefits plans, "I
remember reading it. Every one I got, I read," and he considered
it "customary" among benefits plans to include a reservation of
rights clause.  Tr. at 323-24.

Long had a private conversation with Gianato around
the time of the orientation meeting, during which Gianato told
him, "if you look around here, we've spent billions of dollars
in this operation. . . . I don't think that is an issue,"
referring to Long's concerns that CONSOL might terminate
benefits based on the reservation of rights clause.  Tr. at 298,
319.  Long understood that Gianato was not saying that
termination would never happen, but instead that it was
Gianato's opinion, based upon the state of the company at the
time, that the company was unlikely to terminate benefits.  Tr.
at 319-20.  Thus, Long could not have detrimentally relied on
this statement by Gianato.

Long left Enlow Fork mine in 1999, was briefly not employed, and was then reemployed by CONSOL in 2001 at Mine 84, also in Pennsylvania. Tr. at 301, 310. While not employed with CONSOL, Long received medical coverage through COBRA for about three months, for which he paid $1,200 per month. Tr. at 301. Long returned to work for CONSOL in part because he thought he needed three more years of service to qualify for retiree medical benefits. Tr. at 302. When Long went to work at Mine 84, the HR representative at the mine, Tex Berlin, informed him that the benefits were the same as those at Enlow Fork. Tr. at 303. Long did not consider that to be a promise of lifetime benefits. Tr. at 310. In May 2003, Long informed the superintendent of Mine 84 that he intended to retire. Tr. at 303. He retired effective June 25, 2003, at which point he began receiving retiree welfare benefits. Tr. at 303-04.

Long subsequently began working for a company unaffiliated with CONSOL called Foundation Coal, later purchased by Alpha Natural Resources, also unaffiliated with CONSOL. Tr. at 304. That company offered healthcare benefits which Long did not accept inasmuch as he was already receiving retiree welfare benefits through CONSOL, with which he was satisfied. Tr. at 304. He worked at Alpha for about 5 years, long enough to qualify for retiree benefits from that company. Tr. at 304-05.

In 2014, Long received a letter dated March 14, 2014, informing him that as of April 1, 2014, his medical benefits would no longer be covered by CONSOL, and would instead be covered by Murray Energy.  Tr. at 327-28, 306; Pls.' Ex. 8. This was part of a deal between Murray Energy and CONSOL after the sale of part of CONSOL's assets to Murray Energy.  Tr. at 329.  In an April 8, 2014 letter, Murray Energy informed Long that his retiree benefits would terminate as of December 31, 2014.  Tr. at 307; Pls.' Ex. 8 at MSJ 001002.  Long's retiree welfare benefits did in fact terminate on December 31, 2014. Tr. at 308.  Long had no knowledge as to whether CONSOL was involved in Murray's decision to terminate benefits on December 31, 2014.  Tr. at 332.

Long acknowledged that CONSOL made no written promises regarding retiree medical benefits and that he knew throughout his career that CONSOL in writing had reserved the right to terminate medical benefits for both its current employees and its retirees.  Tr. at 313.  Long also publicly stated that, "Everybody got that when they were hired," referring to a CONSOL written benefit plan that contained a reservation of rights clause.  Tr. at 318.

Long estimated that he accrued $39,800 in out-of-pocket medical expenses for surgery and drugs between December 31, 2014 and December 31, 2019.  Tr. at 332.

Because Long was actually aware of the reservation of rights clause at the beginning of his career and on an ongoing basis throughout his career, it is clear that he could not have reasonably relied on any statements or misrepresentations to the effect that he would have lifetime benefits without the possibility of modification or termination.

**Emmet Casey, Jr.**

Emmet Casey, Jr. began working at the Bishop coal mining operation, owned by Consolidated Coal and Pocahontas Fuel, in 1973.  Tr. at 122-123.  From 1973 until 1976, Casey worked as an hourly union employee.  Tr. at 91.  In 1976, Casey became a foreman, a non-union salaried position.  Tr. at 91.  In April 1992, Casey began working at the Buchanan mine in Virginia, first as an hourly, non-union employee, and then from November 1992 until his 2013 retirement, as a salaried non-union employee.  Tr. at 123-124.  Casey retired on February 1, 2013, at the age of 58.  Tr. at 90.

In 1976, Casey attended a "foremen's class," to train to become a mine foreman, during which the class instructors

discussed the benefits of becoming a salaried employee.  Tr. at 91-92.  The individuals who discussed the benefits were HR employees named Archie Maynard and Jim Jones.  Tr. at 92. Maynard and Jones told class participants that:

> [o]nce you reached the age of retirement, you, your wife, and your children would have medical until you deceased, and then your wife would have it until she deceased or was remarried, and your children would have it until they reached a certain age or they were employed by a company that offered healthcare, and that once you reached the age of 65, you had to sign up on Medicare.  Then the CONSOL plan would be your supplemental plan.

Tr. at 93.  Maynard and Jones told participants that the retiree welfare plan covered medical, dental, eye, and the option to purchase life insurance.  Tr. at 93.

After working at Bishop, Casey worked at numerous mine sites, including Rowland, Jenkinjones, Itmann, Matthews and Amonate.  Tr. at 95.  It is not clear from the record the periods during which Casey worked at these sites or what entity owned these sites at those times.  In April 1992, he moved from Amonate to the Buchanan mine in Southwestern Virginia, where he was employed as an hourly employee.  Tr. at 95.

When he started at Buchanan, Casey attended an orientation meeting at the regional office in Bluefield, Virginia, led by HR manager John Fox.  Tr. at 95, 98.  Fox explained at that meeting that employees would have healthcare coverage from retirement until death, that their spouses would

24

have coverage until their death or remarriage, and that children

of employees would have coverage until they reached a certain

age or obtained their own employment coverage.  Tr. at 96.

Casey believed Fox's job function included explanation of

benefits to employees.  Tr. at 99.  While Casey initially

testified that nobody from CONSOL discussed at that meeting the

fact that CONSOL had reserved the right to terminate retiree

welfare benefits, Tr. at 100, Casey acknowledged that a handbook

may have been read to him and he recognized that certain pages

that contained a reservation of rights may have been read to

him.  Tr. at 136-39.

Casey chose to work at the Buchanan mine so that he

could continue to work for CONSOL and "get to retirement age;"

however, it is not stated that his decision was based on a

belief that the retiree welfare benefits would extend throughout

his life.

During his orientation at Buchanan in 1992, Casey

received the handbook from CONSOL similar to Plaintiff's Exhibit

5, which applied to hourly, non-union employees, known as "P&M"

employees at CONSOL.  Tr. at 133-134; see Defs.' Ex. 5.  As

testified by Fox, during the orientation, Fox reviewed the

entire handbook with employees, and Fox read it aloud "word-for-

word," including the language that the company reserved the

right to change or terminate benefits but without further
discussion of the reservation.  Tr. at 135, 1131-34, 1137-38;
Pls.' Ex. 5.  Casey also received a document titled "Benefits
Plans for Salaried Employees" around 2004 which contained the
reservation of rights clause.  Tr. at 149; Pls.' Ex. 6 at 7.

During his time at Buchanan, Casey attended three
meetings held during periods of active union organizing, during
which CONSOL HR employees favorably compared CONSOL's non-union
benefits to those of union employees.  Tr. at 102.  Those
meetings were led by Gene Bailey, John Fox, and an unnamed
individual from the corporate office in Pittsburgh.  Tr. at 102.
Casey understood the UMWA plan to be guaranteed for life.  Tr.
at 105-06.  Nobody at the union comparison meetings mentioned
that CONSOL reserved the right to terminate benefits.  Tr. at
106.  Casey was an hourly employee during one of those meetings
and a salaried employee for the other two.  Tr. at 125.

Casey also attended refresher meetings which involved
discussions of retiree welfare benefits, occurring roughly every
year to three years throughout the course of his career at
CONSOL.  Tr. at 107-08.  During these meetings, HR
representatives would tell employees that their benefits
extended for their entire lives, as well as their spouse's
lives, and covered their children until they reached a certain

age.  Tr. at 107-08.  Nobody at the refresher meetings mentioned that CONSOL reserved the right to terminate benefits.  Tr. at 109.

Casey was informed of the reservation of rights language at the time of the 1992 orientation meeting and received the handbook in 1992 and a Benefits Plan for Salaried Employees in 2004 that contained the reservation of rights provision.

Casey received a letter around Fall of 2014 which notified plan participants that their retiree medical benefits plan would terminate on December 31, 2019.  Tr. at 113; see Pls.' Ex. 1.  Casey had coverage with CONSOL until it was terminated instead on December 31, 2015.  Tr. at 113-14; see Pls.' Ex. 2.  Casey, however, became Medicare eligible in July 2015, so that the CONSOL coverage was supplementary from July 2015 until it terminated in December 2015.  Tr. at 114.  From the beginning of 2016 until sometime in 2017, Casey was on his wife's plan through her employer, for which he paid a premium. Tr. at 114.  At some time in 2017, his wife was laid off, at which point he enrolled in a COBRA plan.  Tr. at 114.

Casey and his wife spent $35,444 for medical expenses during the 2016-2019 period.  Tr. at 118; see Pls.' Ex. 4.  That amount does not account for the premiums which he would have had

to pay during that time period.  Tr. at 154.  During the 2012-2015 time period, while enrolled in a CONSOL plan, he paid $25,586.65 in premiums.  Tr. at 154.

## Connie Z. Gilbert

Connie Z. Gilbert worked for CONSOL from 1994 to 1997, and then again from June 2005 until September 30, 2014.  Tr. at 207-08; 232-33.  Starting in June 2005, Gilbert worked in a salaried position at the Buchanan mine in Southwestern Virginia. Tr. at 208.  Employees hired or rehired after August 1, 2004 were not eligible for retiree medical benefits and were not made eligible until March 16, 2007.  Tr. at 910; Defs.' Ex. 30.

Gilbert received an SPD dated January 2005, around the time of her restarting employment.  Tr. at 237; Defs.' Ex. 8. That SPD indicates that employees hired or rehired after August 1, 2004 would not be eligible for retiree medical benefits.  Tr. at 240; Defs.' Ex 8.  That document also contains reservation of rights clauses relating to both medical benefits and life insurance.  Tr. at 244-46; Defs.' Ex. 8 at 3371, 3375.  Gilbert highlighted portions of the reservation of rights clause relating to medical benefits.  Tr. at 247.  Gilbert says she made these highlights at some point after she retired.  Tr. at 282.

Although Gilbert was not eligible for retiree medical benefits when rehired in 2005, she did attend an orientation meeting in June 2005, during which Terry Mason, an HR employee, discussed retiree welfare benefits. Tr. at 209. Mason told participants that their retiree welfare benefits, including medical, prescription drug, vision, dental, and life insurance, were as good as those of the UMWA and that employees would have them for life. Tr. at 209. Gilbert understood that UMWA employees had insurance for life and believed Mason understood that the other employees knew that as well. Tr. at 210-11, 270. While she believed Mason's representations, she did not testify that she relied to her detriment on these statements about the likely future of her benefits, which she knew did not then include retirement welfare benefits for her. Nobody from CONSOL discussed the fact that the company had reserved the right to terminate benefits during that meeting. Tr. at 210.

CONSOL HR employees, including Mason, Nancy Johnson, Gerald Kowzan, and Mike Adams, would also make comparisons to union benefits any time union organizing activity escalated at the mine, which Gilbert attended. Tr. at 212. The HR representatives did not discuss that CONSOL reserved the right to terminate benefits in these meetings. Tr. at 213. These HR representatives did not tell employees that benefits would be

guaranteed for life, but Gilbert interpreted the favorable comparisons to the UMWA benefits to be an indication that they would be.  Tr. at 271-72.

Gilbert also attended a retirement seminar led by unnamed corporate employees for her husband, another Buchanan employee, in Pittsburgh in 2006, when he was retiring from CONSOL.  Tr. at 213-14.  The corporate employees told prospective retirees and their spouses that they would continue to receive their current benefits after they retired and their spouses would continue to receive those benefits as well when the employee died.  Tr. at 214.  At the time of her husband's 2006 seminar, Gilbert was still ineligible for employee retiree medical benefits inasmuch as she had been rehired after August 1, 2004.  Gilbert did not testify that she relied to her detriment on these statements about the likely future of her benefits.  Gilbert did not attend a retirement seminar for her own 2014 retirement.  Tr. at 213.

Though Gilbert was unable to recall whether she received a 2011 SPD, (Tr. at 216), Gilbert received an employee handbook with information regarding her benefits, which she received and read on or around July 2010.  Tr. at 248-51; Defs.' Ex. 9.  Gilbert highlighted this document as well.  Tr. at 249-50.  That document contains a reservation of rights clause.  Tr.

at 251; Defs.' Ex. 9 at 003300.  Gilbert saw the reservation of
rights clause in 2010 when she reviewed the document in 2010.
Tr. at 251.  Gilbert also received a number of Benefits
Enrollment Guides in the period between 2010 and 2014 containing
the reservation of rights clause, which she reviewed and made
notations to.  Tr. at 260-66; Defs.' Exs. 11, 12, 13.  It is
unclear from the record when these notations and highlights were
made.

Gilbert received a call at home from Nancy Johnson, an
HR employee, in September 2014 offering her five years of post-
retirement coverage if she retired before the end of September.
Tr. at 216-17.  Gilbert retired on September 30, 2014.  Tr. at
266.  In June of 2015, Gilbert received a letter from CONSOL,
signed by Kurt Salvatori, which indicated that her benefits
would terminate on December 31, 2015, rather than December 31,
2019.  Tr. at 217-18, 273.  It also offered a pro-rated
transition benefit of $8,000, which Gilbert received.  Tr. at
218.

Gilbert received a SPD at least in 2005 and in 2011
and a number of Benefit Enrollment Guides, all of which included
a reservation of rights of which she was aware.

Prior to her termination, Gilbert's husband was on
Medicare and her CONSOL-provided insurance was her primary

31

insurance and her husband's supplemental insurance.  Tr. at 219.
After her termination, her husband purchased a new supplemental
policy and she enrolled in COBRA for three months, for which she
paid almost $1,300.  Tr. at 219.  Subsequently, Gilbert enrolled
in Medicare.  Tr. at 219.  She currently also has supplemental
insurance for which she pays premiums.  Tr. at 219.  Her
supplemental insurance costs about $2,000 annually and her
husband's supplemental insurance costs $2,400 annually.  Tr. at
219.  Gilbert pays co-payments and deductibles currently, though
she had been doing so under the CONSOL retiree plan as well, and
it is unclear from the record what the difference would be in
out-of-pocket expenses between the two plans.  Tr. at 278.

**Terry Prater**

Terry Prater worked for CONSOL at the Jones Fork mine,
part of CONSOL of Kentucky, from 2000 to 2014.  Tr. at 162.  He
was salaried from 2000 to 2007 and hourly from 2007 until 2014.
Tr. at 162.

Prater was interviewed prior to employment in October
of 2000 by the Jones Fork HR manager Craig Campbell and Jack
Richardson, who Prater understood to be the Vice President for
the Central Appalachian Region.  Tr. at 162-63.  Campbell and

Richardson told him during the interview that if he accepted the job and served 10 years and reached 55 years of age, he would have coverage in retirement for hospitalization, prescription, dental, eye, and life insurance for the rest of his life.  Tr. at 163.  At the time of the interview, Prater was employed elsewhere, and he chose to take the job with CONSOL because it offered retirement benefits, whereas the other jobs he had held did not.  Tr. at 163-65.  This decision constituted detrimental reliance on the material misrepresentation by Campbell and Richardson.  Campbell and Richardson did not discuss the fact that CONSOL reserved the right to terminate retiree welfare benefits.  Tr. at 165.

        Prater attended an orientation meeting shortly after accepting employment with CONSOL, at which Campbell explained benefits to employees.  Tr. at 166.  Campbell told employees at that meeting that once they reached 10 years of service, they would have medical insurance, life insurance, prescription drug coverage, vision insurance, and dental insurance for the rest of their lives.  Tr. at 166.  This statement was a material misrepresentation, upon which Prater relied.  Campbell told employees in relation to the reservation of rights language at the bottom of a film that accompanied the presentation that, "[y]ou don't have to worry about that language there; that's

attorney's language." Tr. at 167, 179-80. Prater testified
that he saw this statement. Id. This was the only instance in
which Prater heard Campbell discuss the reservation of rights
clause. Tr. at 168. Prater believed the representations that
Campbell made about lifetime benefits. Tr. at 168. Prater
acknowledged receiving additional documents during his career
with CONSOL that contained the reservation of rights language
that permitted CONSOL to terminate retiree medical benefits.
Tr. 190, 192-93. Prater saw the reservation of rights clause on
the film, but it is not shown that he read the other documents
that he received containing the reservation of rights clause.
Tr. at 190-93.

       During the first 11 years of Prater's service at
CONSOL, there were numerous cookouts held at the mine site which
were commonly attended by CONSOL corporate employees. Tr. at
168. After the cookouts, Campbell would then talk to employees
about their benefits. Tr. at 168. During those meetings that
Prater attended, Campbell told employees that once they reached
10 years of service and 55 years of age, they would have
medical, prescription drug, dental, vision, and life insurance
for the rest of their lives. Tr. at 168. Campbell told
employees that they "had nothing to worry about for medical or
prescription or dental or eye or life insurance" and that as

long as employees had "10 years in and 55 years of age, we was locked in [and] we wouldn't lose it."  Tr. at 203.  These statements were material misrepresentations upon which Prater relied to his detriment.

On September 30, 2014, Gerald Kowzan arrived at the mine and told employees that those employees who retired on or after October 1, 2014, would not receive retiree welfare benefits, even if they had the sufficient number of years of service and age to retire.  Tr. at 169-170.  This was the first instance in which Prater was actually aware of the reservation of rights clause.  After the meeting concluded, Prater saw another employee, Doug Jennings, ask Kowzan, "[w]hat if we retired today?"  Tr. at 169-70.  Kowzan replied that employees who retired prior to midnight could get five years of insurance coverage, as long as they told their foreman before midnight that they were retiring.  Tr. at 170.  Prater decided to retire on that day so that he could get five years of coverage.  Tr. at 170.

In June 2015, Prater received a letter from CONSOL, signed by Kurt Salvatori, informing him that his benefits would terminate on December 31, 2015, rather than December 31, 2019.  Tr. at 173; Pls.' Ex. 5.  The letter informed recipients that because they had previously elected to reject a transition

payment in order to get temporary benefits, which were now being terminated, the recipient would receive a pro-rated portion of the lump sum benefit.  Pls.' Ex. 5.  Prater received a payment of $8,500.  Tr. at 173-74.

Since his benefits were terminated at the end of 2015, Prater incurred expenses through co-payments and deductibles reflected in Plaintiffs' Exhibit 6.  Tr. at 174; Defs.' Ex. 6. It is unclear from the record how much of these medical expenses would be covered had CONSOL not terminated its benefits.

### Clarence Bright

Clarence Bright began working as an hourly non-union employee as a mechanic at the Fola mine site in West Virginia in 1995.  Tr. at 339-40.  The Fola mine site was then owned by AMVEST Coal, and sold to CONSOL in 2007.  Tr. at 340.  AMVEST Coal did not offer retiree medical benefits to its employees when Bright was employed there.  Tr. at 367-68.  The AMVEST employees acquired by CONSOL, including Bright, continued under the AMVEST plan for about a year.  Tr. at 1221.

Bright and his wife attended an orientation meeting at the Armory in Summersville, West Virginia in 2008, at which corporate HR representatives from CONSOL discussed CONSOL retiree welfare benefits that would thereafter be afforded them.

Id.  Gerald Kowzan told employees that, if they reached 55 years of age and had 10 years of service with the company, they would have retiree welfare benefits until either death or they qualified for Medicare, in which latter case the CONSOL insurance would become secondary to Medicare.  Tr. at 344, 1197. This included medical, prescription drugs, vision, dental, and life insurance.  Tr. at 344.  Bright trusted that representation about the duration of benefits.  Tr. at 345.  He paid a monthly premium to receive his medical benefits.  Tr. at 345.  Bright specifically sought to confirm with Kowzan that he would have retirement insurance if he reached the age of 55 and 10 years of service with the company and Kowzan answered by telling him that "we would have it" and Bright started planning his retirement then.  Tr. at 345-46.  The representatives from CONSOL did not mention the fact that CONSOL reserved the right to terminate benefits.  Tr. at 346.

After the orientation meeting, Bright received documents from CONSOL that stated in writing that CONSOL reserved the right to terminate benefits, though Bright did not read them.  Tr. at 382.  Additionally, Bright attended annual retraining sessions, held either in Drennen or Summersville, West Virginia.  Tr. at 342, 369-70.  These meetings involved discussions of benefits and were led by the HR manager at

37

CONSOL, either Chase Elswick or Susan Osborn.  Tr. at 342, 347.
At those meetings, Elswick and Osborn told employees that they
were "qualified to have" retiree welfare benefits if they
attained 10 years of service and 55 years of age.  Tr. at 347.
Bright believed that Osborn and Elswick were tasked with
conveying information about retiree welfare benefits as part of
their employment duties.  Tr. at 347.  During these meetings,
Elswick and Osborn did not explain that CONSOL reserved the
right to terminate retiree welfare benefits.  Tr. at 348.
Neither Osborn nor Elswick stated at these annual meetings that
benefits were "lifetime," nor made any promises regarding
whether participants would actually have them in retirement.
Tr. 369-74.

Finally, Bright attended a retirement seminar in
Canonsburg, Pennsylvania in either 2011 or 2012.  Tr. at 342.
Unnamed Human Resources employees from the corporate office said
at those meetings that retirees would have medical insurance
when they were eligible and that they would have it until they
qualified for Medicare or they died.  Tr. at 351.  Bright
received an SPD that described his retiree medical benefits
during that retirement seminar.  Tr. at 374.  The SPD contained
a reservation of rights clause though he did not read it.  Tr.
at 374-75; Defs.' Ex. 16.

In 2013, CONSOL began laying off employees at the Fola mine, including Bright's layoff in July 2013, followed by his retirement in May 2014. Tr. at 355-56. CONSOL offered the laid off employees a grace period for health insurance paid by CONSOL during a period in which they had the opportunity to retire, which for Bright was May 2014. Tr. at 352, 356.

After retiring, Bright received medical, dental, vision, and life insurance coverage, for which he paid a $148 monthly premium. Tr. at 359. Bright received a letter from CONSOL in the Fall of 2014, informing him that his retiree medical benefits would terminate at the end of 2019. Tr. at 360; Pls.' Ex. 1. His reaction, as stated by him, was "I figured I was getting screwed, but there was nothing I could do about it." Id. In June of 2015, he received another letter from CONSOL informing him that his benefits would terminate at the end of 2015. Tr. at 363-64; Pls.' Ex. 2. His medical benefits in fact terminated at the end of 2015. Tr. at 364.

For a period of three months after his benefits terminated, Bright went without insurance and consequently paid a $100 per month fine under the Affordable Care Act. Tr. at 365. After those three months, Bright enrolled under his wife's medical insurance plan through her employer. Tr. at 365-66. That insurance did not cover dental or vision costs. Tr. at

366.  Bright paid about $3,000 in dental costs and $1,500 in
vision costs out-of-pocket during the years after losing his
retiree insurance.  Tr. at 366.  He had anticipated that these
medical expenses would have been covered by CONSOL had it not
terminated the benefits.  Tr. at 367.  The total amount he paid
out-of-pocket as a result of losing benefits was around $28,000.
Tr. at 383.  That amount did not account for the $148 per month
he would have to pay for CONSOL insurance.  Tr. at 384.

**Benjamin Fitzwater**

        Fitzwater began working at the Fola mine on August 28,
1995, while it was owned by AMVEST.  Tr. at 551.  Prior to his
employment at Fola, he worked at Bethlehem Steel for over 19
years where he was a member of the UMWA.  Tr. at 552-53.  When
AMVEST sold the Fola mine to CONSOL in 2007, Fitzwater did not
have to reapply for the position he had but was instead able to
stay on in the same position.  Tr. at 552.  He worked there
until he was laid off on February 14, 2013.  Tr. at 551.  He was
an hourly employee for the entire time he worked at Fola.  Tr.
at 552.

        The incoming Fola employees were brought into the
CONSOL retiree medical benefits plan.  Fitzwater received the
SPD for P&M employees at Amvest that contained the reservation
of rights for CONSOL to terminate the plan at any time.  Tr. at

40

713, 716; Defs.' Ex. 19 at 9, 53.  Fitzwater also received
thereafter a number of other CONSOL documents that said the same
thing.  Tr. at 717-24.  Fitzwater received CONSOL Healthcare
Highlights documents for 2009, 2013, and 2014.  Tr. at 721-26;
Defs.' Ex. 20.  Those documents all contained reservation of
rights clauses as well.  Tr. at 723-26; Defs.' Ex. 20, 21, 22.

Fitzwater attended a meeting at the Armory in
Summersville, West Virginia, held around 2008.  Tr. at 554-55.
Benefits were discussed at the meeting by three unnamed HR
employee.  Tr. at 559.  One of those HR employees told the group
that if they reached the age of 55 and had 10 years of service,
they would receive medical, hospitalization, vision, dental, and
life insurance, as well as a pension upon retiring.  Tr. at 560-
61.  Fitzwater asked the HR employees whether there was a
guarantee of medical insurance and they told him he would get
answers to that question at a later date, but heard nothing
further.  Tr. at 562-63.

Around 2009 or 2010, Fitzwater received a document
titled "Know the Facts," which described certain aspects of the
retiree medical benefits.  Tr. at 563-64; Pls.' Ex. 11.  The
shift foreman or the mine superintendent would customarily pass
out documents of this kind and he received several like it while
at CONSOL.  Tr. at 563-64.  The document states in part "You are

41

eligible for retiree healthcare or a healthcare reimbursement account if you were hired after January 1, 2007, once you have 10 years of service and reach age 55." Tr. at 564. It also states that, "[t]his is a better deal than the UMWA negotiated in the national contract." Tr. at 564.

Around 2010, during a period of active union organizing, Fitzwater had several conversations with Chase Elswick, as well as the mine superintendent, Wayne Keener, about the differences between the UMWA benefits and CONSOL's benefits. Tr. at 565-66. Based on these conversations, Fitzwater believed that he would have medical insurance for life so long as he paid the premiums. Tr. at 566. While he does not say "for life" was mentioned, during these meetings nobody from CONSOL mentioned that the company reserved the right to terminate retiree welfare benefits. Tr. at 566-67.

On February 14, 2013, Fitzwater and a large number of other employees were laid off. Tr. at 567. Within about one week of the layoff, Fitzwater received a document from CONSOL titled "Benefits Information Sheet (over 10, over 55). Tr. at 568, 727; Pls.' Ex. 12. That document contained a reservation of rights clause. Tr. at 727. Fitzwater continued to receive medical benefits, which CONSOL made premium-free for one year following the layoff. Tr. at 569-70. After February 14, 2014,

Fitzwater retained his CONSOL retiree welfare benefits insurance, for which he paid a premium until he retired on October 1, 2014.  Tr. at 571, 576-78.

On September 8, 2014, Fitzwater terminated his CONSOL insurance, effective October 1, 2014, except for his life insurance, for which he has since paid no premium, and he enrolled in the UMWA medical benefits plan as of October 2014. Tr. at 578-79, 581.  The UMWA plan covers all but dental and life insurance.  Tr. at 736.  After Fitzwater retired and switched his coverage for medical insurance to UMWA, CONSOL made its Fall of 2014 announcement that it was terminating retiree welfare benefits coverage, including life insurance, as of December 2019.  Tr. at 584, 707.

At the time of his retirement, Fitzwater was eligible for UMWA retirement benefits, as well as a CONSOL pension, as he had over 23 years working as a union miner.  Tr. at 553, 579. As of trial, Fitzwater was still enrolled in the UMWA retiree medical benefits.  Tr. at 579.  He anticipates that he would continue to receive medical benefits indefinitely, based on an agreement between the UMWA, CONSOL, and the federal government. Tr. at 579-80.  Under the UMWA plan, Fitzwater pays $200 per year plus a $20 co-payment for doctor visits.  Tr. at 586, 736. Fitzwater considered the UMWA plan as "far better than what we

had with CONSOL," though it does not cover dental or life insurance, which the CONSOL plan did.  Tr. at 736, 746.

Fitzwater has paid around $4,000 in dental co-payments since electing UMWA coverage.  Tr. at 737.

## II.  CONCLUSIONS OF LAW

Following the court's memorandum opinion and order on summary judgment, plaintiffs claim that defendants breached their fiduciary duty to plaintiffs by misrepresenting the duration of their retiree welfare benefits.

### A. Governing Law

#### 1. Breach of Fiduciary Duty

Section 404(a)(1)(A)(i) of ERISA provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and — (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries." 29 U.S.C. § 1104(a)(1)(A)(i).  This section falls within ERISA's fiduciary responsibility provisions.  See Faircloth v. Lundy Packing Co., 91 F.3d 648, 656 (4th Cir. 1996) (citing 29 U.S.C. §§ 1101–14); Varity Corp. v. Howe, 516 U.S. 489, 506 (1996) ("To participate knowingly and significantly in deceiving a plan's beneficiaries

44

in order to save the employer money at the beneficiaries' expense is not to act 'solely in the interest of the participants and beneficiaries.'"); DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 418 (4th Cir. 2007).  ERISA obligates fiduciaries not only to avoid making any material misrepresentations to beneficiaries, but also "incomplete, inconsistent, or contradictory disclosures that misinform beneficiaries."  George v. Duke Energy Ret. Cash Balance Plan, 560 F. Supp. 2d 444, 474 (D.S.C. 2008) (citing Griggs v. E.I. DuPont de Nemours & Co., 237 F.3d 371, 380 (4th Cir. 2001)).

In order to establish a claim for breach of fiduciary duty based on alleged misrepresentations regarding coverage under an employee welfare plan, a plaintiff must prove "(1) the defendant's status as an ERISA fiduciary acting as a fiduciary; (2) a misrepresentation on the part of the defendant; (3) the materiality of that misrepresentation; and (4) detrimental reliance by the plaintiff on the misrepresentation."  Burstein v. Ret. Account Plan For Employees of Allegheny Health Educ. & Research Found., 334 F.3d 365, 384 (3d Cir. 2003) (quoting Daniels v. Thomas & Betts Corp., 263 F.3d 66, 73 (3d Cir.2001)); see also Adams v. Freedom Forge Corp., 204 F.3d 475, 492 (3d Cir. 2000) ("An employee may recover for a breach of fiduciary duty if he or she proves that an employer, acting as a

45

fiduciary, made a material misrepresentation that would confuse a reasonable beneficiary about his or her benefits, and the beneficiary acted thereupon to his or her detriment"); James v. Pirelli Armstrong Tire Corp., 305 F.3d 439, 449 (6th Cir. 2002); Wiseman v. First Citizens Bank & Tr. Co., 215 F.R.D. 507, 510 (W.D.N.C. 2003); Tootle v. ARINC, Inc., 222 F.R.D. 88, 94 (D. Md. 2004).

### i. ERISA Fiduciaries

ERISA contemplates two types of fiduciaries. See, e.g., Mertens v. Hewitt Assocs., 508 U.S. 248, 251 (1993); Dawson-Murdock v. National Consulting Group, 931 F.3d 269, 275 (4th Cir. 2019). The first type is a "named fiduciary," which is "a fiduciary who is named" in the plan documents. See 29 U.S.C. § 1102(a)(2). ERISA requires every covered employee benefit plan to "provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan." Id. § 1102(a)(1). That obligation "ensures that responsibility for managing and operating the plan — and liability for mismanagement — are focused with a degree of certainty." See Tatum v. RJR Pension Inv. Comm., 761 F.3d 346, 371 (4th Cir. 2014) (alterations and internal quotation marks omitted).

The second type of fiduciary contemplated by ERISA has been called a "functional fiduciary."  See e.g., Custer v. Sweeney, 89 F.3d 1156, 1161 (4th Cir. 1996) ("[T]he concept of a fiduciary under ERISA ... includes not only those named as fiduciaries in the plan instrument, ... but [also] any individual who de facto performs specified discretionary functions with respect to the management, assets, or administration of a plan") (alterations and internal quotation marks omitted).  Under ERISA, "a person is a fiduciary with respect to a plan to the extent ... he has any discretionary authority or discretionary responsibility in the administration of such plan."  29 U.S.C. § 1002(21)(A).  "The phrase 'to the extent' indicates that a person is a fiduciary only with respect to those aspects of the plan over which he exercises authority or control."  Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enters., 793 F.2d 1456, 1459–60 (5th Cir. 1986).

So it is that ERISA defines the term fiduciary in "functional terms of control and authority over the plan." Mertens v. Hewitt Assocs., 508 U.S. 248, 262 (1993) (emphasis in original).  "In every case charging breach of ERISA fiduciary duty, then, the threshold question is not whether the actions of some person ... adversely affected a plan beneficiary's

interest, but whether that person was acting as a fiduciary
(that is, was performing a fiduciary function) when taking the
action subject to complaint." Pegram v. Herdrich, 530 U.S. 211,
226 (2000).

An employer's status as "an ERISA plan sponsor does
not automatically convert the employer into a plan fiduciary."
Moon v. BWX Techs., Inc., 577 F. App'x 224, 229 (4th Cir. 2014)
(citing Beck v. PACE Int'l Union, 551 U.S. 96, 101 (2007)).  An
employer "can be [an] ERISA fiduciar[y] and still take actions
to the disadvantage of employee beneficiaries, when they act as
employers (e.g., firing a beneficiary for reasons unrelated to
the ERISA plan), or even as plan sponsors (e.g., modifying the
terms of a plan as allowed by ERISA to provide less generous
benefits)." Pegram, 530 U.S. at 225.  Thus, a functional
analysis is necessary to determine if an employer acted as a
fiduciary and owed a fiduciary duty regarding particular
conduct.  See id. at 226; Coleman v. Nationwide Life. Ins. Co.,
969 F.2d 54, 61 (4th Cir. 1992) (explaining that "a court must
ask whether a person is a fiduciary with respect to the
particular activity at issue"); Estate of Weeks v. Advance
Stores Co., 99 F. App'x 470, 476 (4th Cir. 2004) ("[O]ur
determination of whether a person qualifies as an ERISA

fiduciary is based on a person's job activities rather than job title.").

The Supreme Court in <u>Varity</u> concluded that a discretionary act of plan administration "includes the activities that are 'ordinary and natural means' of achieving the 'objective' of the plan," including offering information about the meaning of the plan's terms or "[c]onveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation." 516 U.S. at 502–04.

Given the necessarily fact intensive inquiry required in assessing fiduciary status, the court is particularly guided by the Supreme Court's decision in <u>Varity</u> and the factors the Court analyzed in reaching its conclusion in that case. 516 U.S. 489. In <u>Varity</u>, the Court held that the defendant, which was both the plaintiffs' employer and their welfare benefit plan administrator, acted in a fiduciary capacity when, at a meeting convened by the defendant-employer, it advised the plaintiffs that their benefits would remain secure if they voluntarily transferred to a newly-created subsidiary corporation to which the defendant was transferring certain money-losing divisions in which the plaintiffs worked. <u>Id.</u> The defendant knew, though, that the subsidiary was insolvent from the time of its creation.

Id.  The subsidiary ended in a receivership after two years, under which its employees, including the plaintiffs, lost their welfare benefits.  Id.

In finding that the employer-administrator was acting as a fiduciary when making representations to employees about the likely future of their benefits plan, the Court relied on (1) "the factual context in which the statements were made," (2) "the plan-related nature of the activity," (3) that the activity was held by those who had authority to engage in the conduct under the plan, and (4) that reasonable employees could have thought the employer was communicating to them as both a plan administrator and as an employer.  Id. at 503.

CONSOL pursued a union-free strategy that involved a wide-reaching and long-standing effort to convince employees to take up employment at CONSOL's union-free mines and to not engage in unionization activities once employed.  Consol did so in overselling CONSOL's retirement benefits program by comparison to union benefits that were guaranteed for life and by overt misrepresentation about the likely future of those benefits.  This union-free strategy was designed to be uniform across the company at the direction of the Chief Executive Officer of the company.  The misrepresentations that plaintiffs were told in this case regarding the future of their benefits

were part of that strategy, designed to save CONSOL large sums
of money over decades.

     The formal arrangement of the plan administration,
that is delegation of administrative functions in the plan
documents to the Vice President of HR, allowed CONSOL to
nominally relinquish fiduciary responsibilities while still
retaining substantial <u>de</u> <u>facto</u> control over the individual who
had those responsibilities.  The company retained the power to
hire or fire the Vice President of HR, paid his or her salary,
and controlled his or her daily employment functions.  By tying
the named fiduciary role to a position within the company rather
than an individual, CONSOL ensured that the plan fiduciary would
always be an individual that it retained substantial control
over.  No showing was made by the defendants that CONSOL
provided any safeguards against the conflict of interest
inherent in having one of its agents for day-to-day operations
act as the plan fiduciary, with the substantial ERISA-imposed
obligations owed to plan participants.  Thus, CONSOL never fully
deputed the administrative power over the plan to the named
fiduciary.

     When HR managers held meetings during which they
discussed benefits, it is clear that they did so as agents of
CONSOL.  Each of the HR managers was engaged in conduct within

the scope of their employment when explaining the likely future
of plaintiffs' benefits plans to plaintiffs during interviews,
orientation meetings, union awareness meetings, and refresher
meetings.  See Restatement (Second) of Agency § 228 (1958).
They represented CONSOL during these meetings and when making
representations about CONSOL's benefits plan.  Thus, CONSOL
acted in the only way a corporation can act, through its agents,
to promote its benefits package to both current employees and
prospective employees.

     The formal arrangement also allowed plan
administrative and employment functions to blend together, most
crucially as it related to communications with employees about
their benefits.  Salvatori testified at trial that when
communications "involved plan administration or training changes
to the plan themselves from me, they were communications by the
fiduciary.  If the communications involved other items, it would
be in my role as Vice President of Human Resources."  Tr. at
947.  Yet, when the mine HR managers reported to the orientation
meetings, union awareness meetings and other gatherings, they
did so to discuss both plan-related and non-plan related topics.
See e.g., Tr. at 100.  Salvatori, in his role as Vice President
of HR, reviewed scripts that HR managers utilized to explain

benefits to participants, in part by making favorable comparisons to the UMWA benefits.  Tr. at 949-50.

The fact that HR managers appeared at these meetings to discuss benefits, including the likely future of those benefits, would have created reasonable confusion for ordinary employees and could have led them to reasonably conclude that their HR managers were there to speak as agents of the fiduciary.  A reasonable employee would have understood that the Vice President of HR for their company was responsible for HR functions and that the HR managers were his designees for matters concerning HR.  Reasonable employees could conclude that these HR managers were there as agents of the Vice President of HR in his role as fiduciary of their benefits plans.  There is little evidence that during these meetings, efforts were taken to dispel the confusion that this arrangement patently engendered.

Finally, the discussions regarding benefits during these meetings were plan-related in nature inasmuch as they were targeted towards employees' choices affecting plan benefits. Because the receipt of benefits was tied to years of service and age at retirement, discussions that persuaded employees to commence or continue working for CONSOL based on its purportedly competitive benefits package were plan-related.  If employees

had chosen to unionize or leave CONSOL and work at union mines,
they would have participated in the UMWA-negotiated benefits
plan.  Discussions making misleading comparisons to union
benefits that persuaded employees to stay with CONSOL's benefits
plan rather than the UMWA benefits plans, were plan-related.

Thus, these meetings involved plan-related
communications by agents of CONSOL, which retained control over
plan administration, in a situation that would have led a
reasonable employee to believe that the HR managers were
communicating with them as representatives of both a plan
administrator and as an employer.  The factual context in this
case, that these misrepresentations and misleading
communications occurred across mine sites, over decades, and
were pursuant to a lucrative and conscious strategy of avoiding
unionization and recruiting employees further bolsters the
conclusion that CONSOL was acting as a fiduciary in holding
these meetings.

In assessing fiduciary status, the Fourth Circuit has
"consistently utilized an interpretive bulletin published by the
Department of Labor in 1975," referring to 29 C.F.R. § 2509.75-
8.  Dawson-Murdock, 931 F.3d at 276.  However, the Department of
Labor bulletin does not control this situation.  The Department
of Labor bulletin provides that "a person who performs purely

ministerial functions ... within a framework of policies, interpretations, rules, practices and procedures made by other persons," such as "[o]rientation of new participants and advising participants of their rights and options under the plan," and "[p]reparation of employee communications material," is not a fiduciary of an employee benefit plan.  29 C.F.R. § 2509.75-8 (D-2).  While the bulletin might insulate the HR managers themselves from liability, it does not apply to CONSOL itself, whose role in the administration of the benefits plans was far greater than "purely ministerial."

Circuit precedent further confirms that CONSOL was acting as a fiduciary in holding these meetings during which benefits were discussed.  The Third Circuit in In re Unisys Retiree Med. Benefit "ERISA" Litig. explained that "an employer acts as a fiduciary when explaining plan benefits and business decisions about plan benefits to its employees," where human resources staff and supervisors, who had actual or apparent authority to make such communications, advised the plaintiffs regarding the cost and duration of retiree medical benefits. 579 F.3d 220, 230 (3d Cir. 2009) (citations omitted).  The court endorsed as "legally sound," inter alia, the magistrate judge's application of basic agency principles in attributing the conduct of HR employees to the employer.  Id.; see also Taylor

v. Peoples Natural Gas Co., 49 F.3d 982, 988 (3d Cir. 1995)
(finding fiduciary liability where agents of the plan
administrator advised participants about potential future
amendments to the plan).

        The Sixth Circuit decision in Deschamps v. Bridgestone
Americas, Inc. is similarly informative.  840 F.3d 267 (6th Cir.
2016).  The court concluded that where agents of the employer
"convey[ed] information about the Plan's terms and the likely
benefits that [the employee] would receive in the future, thus
purportedly allowing him to make an informed choice about his
continued participation in the Plan," the employer acted as a
fiduciary.  Id. at 278.

        The Fourth Circuit has likewise recognized that
"conveying information about plan benefits to a beneficiary in
order to assist plan-related decisions can constitute fiduciary
activity."  Dawson-Murdock, 931 F.3d at 280 (4th Cir. 2019); see
also Griggs, 237 F.3d 371, 379-80 (accepting that plan
administrator acted in fiduciary capacity by communicating with
participant about pension benefits).

        Defendants compare this case to the unpublished
opinion of Adams v. Brink's Co., in which the Fourth Circuit
found that an employer had not engaged in discretionary activity
when one of its employees gave a misleading answer to an

56

employee's question about benefits during a meeting where the discussion had otherwise not related to benefits.  261 Fed.Appx. 583, 591 (4th Cir. 2008).  The Fourth Circuit specifically distinguished that case from Varity by pointing out that the meeting did not otherwise involve any other communications about benefits and that was the only instance in which that individual communicated about benefits.  Id.  Insofar as the statements at issue in this case were made by HR employees who were specifically tasked with communicating about benefits and whom employees understood to have that role within the company during meetings where benefits discussions were intended to be discussed centrally, Adams is largely disanalogous.

Likewise, the district court decision of Weeks, which defendants rely upon, is distinguishable from the present case. See Weeks v. Western Auto Supply Co., 2003 WL 21510822 (W.D. Va. June 25, 2003).  The court in that case found that an administrative employee was not engaged in discretionary activity when she simply repeated information about benefits that was given to her by upper-management or that had already been inputted into the company's computer database.  Id. at *6-7.  Like Adams, Weeks involved one employee giving an answer to a question, which though incorrect or misleading, appeared to be

an innocent mistake.  _Weeks_ provides little guidance given the widespread and purposeful nature of CONSOL's misrepresentations.

Lastly, defendants rely on _Livick v. The Gillette Co._, which is factually distinguishable from this case.  524 F.3d 24. The court found that an inaccurate estimate of future pension benefits given by a human resources representative to a plan participant was not a fiduciary task.  _Id._ at 29.  Defendants cite the case, though, for the proposition that an ERISA fiduciary can only be held liable for non-fiduciary agents' activities where the fiduciary agents have themselves been authorized to engage in fiduciary, rather than merely ministerial, tasks.  The holding in _Livick_ was far more circumscribed, as it only addressed the argument that a fiduciary had duties in its hiring, retaining, and failing to train non-fiduciaries in carrying out ministerial tasks, except in certain circumstances outlined in part of the Department of Labor's interpretive bulletin.  _Id._ at 30.  CONSOL's liability is not based on its failure to sufficiently hire or train its HR managers, but instead on its instructing HR managers to carry out a corporate strategy that resulted in misrepresentations being made.

Thus, the court is satisfied that CONSOL was acting as a fiduciary through its agents, the HR managers, in conducting

the various meetings at which it made material
misrepresentations regarding the retiree welfare benefits.


### ii. Material Misrepresentation and Reliance

CONSOL, acting as a fiduciary, had a duty not only to
"refrain from intentionally misleading a beneficiary," but also
a "fiduciary obligation 'not to misinform employees through
material misrepresentations and incomplete, inconsistent or
contradictory disclosures.'" Griggs, 237 F.3d 371 (quoting
Harte v. Bethlehem Steel Corp., 214 F.3d 446, 452 (3d Cir. 2000)
(internal quotation marks omitted), cert. denied, 531 U.S. 1037
(2000)); see also Adams, 261 F. App'x at 595 ("Under ERISA, a
fiduciary has a duty to provide beneficiaries with accurate
information").

The Sixth Circuit has held that a reservation of
rights clause in plan documents does not necessarily insulate an
employer from liability where the employer orally provides
misleading information about the future of a benefits plan.
James v. Pirelli Armstrong Tire Corp., 305 F.3d 439, 454–55 (6th
Cir. 2002) (citing Sprague v. Gen. Motors Corp., 133 F.3d 388
(6th Cir. 1998)). In James, the company's HR representative and
plan manager told employees that medical benefits would not and
could not change in retirement – a statement that was inaccurate

under the terms of the plan.  305 F.3d at 443, 456.  The court
found that the breach of fiduciary duty claim was not limited to
those plaintiffs who directly inquired about the reservation of
rights clause, after which they were incorrectly told "not to
worry about that provision."  Id. at 451.  Although the plan
itself contained a reservation of rights clause, the court
concluded that the employer breached its fiduciary duty by "on
its own initiative, provid[ing] all Plaintiffs with materially
misleading or inaccurate information about the future benefits
of the plan."  Id. at 456.

        In the ERISA context, "a misrepresentation is material
if there is a substantial likelihood that it would mislead a
reasonable employee in making an adequately informed decision in
pursuing ... benefits to which she may be entitled."  Id. at 449
(citing Krohn v. Huron Mem'l Hosp., 173 F.3d 542, 547 (6th Cir.
1999)).  This court previously held that plaintiffs had created
a genuine issue of material fact to support their fiduciary duty
claim against the corporate defendants insofar as the
misrepresentations in the case, if believed, would have been
material inasmuch as they would have been a critical factor for
plaintiffs in their decision to continue working for CONSOL's
non-union mines.  See Summ. J. Mem. Op. & Order at 48.

Finally, "detrimental reliance is not limited to the retirement decision alone; rather it may encompass decisions to decline other employment opportunities, to forego the opportunity to purchase supplemental health insurance, or other important financial decisions pertaining to retirement." In re Unisys Corp., 579 F.3d at 229. Still, "courts may not infer the existence of detrimental reliance or prejudice without some affirmative evidence to that effect." Gable v. Sweetheart Cup, 35 F.3d 851, 859 (4th Cir. 1994).

Allan H. Jack

Allan Jack and his wife attended an orientation meeting held for new hires at a time when he had a job without retirement benefits 112 miles away. At that meeting, CONSOL, acting through Luke Gianato, the HR manager for Enlow Fork, materially misrepresented benefits to Jack by affirming to him that he would have "healthcare for life" if he met the eligibility requirements of 10 years of service and 55 years of age. Tr. at 30-31. Such a misrepresentation would have misled a reasonable employee as to the duration of their benefits and the likelihood that they could be terminated in the future.

Jack detrimentally relied on that statement by terminating his prior employment, with which he was satisfied, and deciding to move 112 miles away to the Enlow Fork mine. Tr.

at 30-32.  Jack placed principal importance on the availability
of retiree welfare benefits in deciding to make that move.  Tr.
at 30-31, 81.  Jack was unaware at the time of the orientation
that CONSOL had reserved the right to terminate his benefits.
TR. at 30, 57.

Gianato continued to make the same material
misrepresentations to Jack at various annual refresher meetings
that he would have retirement medical benefits for life if he
met the eligibility requirements.  Tr. at 33.  During union
awareness meetings, other HR employees made misrepresentations
to Jack that he would have healthcare for life and that his
benefits "would always be better than the [union] Mine Workers."
Tr. at 34-35.  Given the importance Jack placed on having
lifetime retiree welfare benefits in his initial employment
decision and the fact that Jack was never made aware during his
employment period that CONSOL reserved the right to terminate
benefits, Jack appears to have continually relied on these
misleading characterizations of his benefits by remaining with
CONSOL, rather than seeking alternative employment that did
provide retiree welfare benefits.

Finally, Jack relied on the material misrepresentation
made at a retirement seminar about a year prior to his
retirement that he would continue to receive retiree welfare

benefits for life after retiring, as the receipt of lifetime benefits allowed him to make up his mind regarding retirement in 2009. TR. at 39, 41. The court, accordingly, concludes that Jack has proven his breach of fiduciary duty claim by a preponderance of the evidence.

### Robert H. Long

Robert H. Long did not rely on any representations made during his orientation meeting or at any other time. Long was aware of the fact that CONSOL had reserved the right to terminate his benefits at any time and for any reason as early as 1969, the very beginning of his employment with CONSOL. Tr. at 290, 323. Throughout his career, LONG received and reviewed every piece of written material CONSOL provided describing his benefits and each document he reviewed contained a clause reserving the right to terminate benefits. TR. at 323.

The court, accordingly, ORDERS that Long's breach of fiduciary duty claim be, and it hereby is, dismissed.

### Emmet Casey, Jr.

Emmet Casey, Jr. did not detrimentally rely on any representations said to have been made to him during his tenure with CONSOL that led to his stated belief that he would have retiree welfare benefits for life upon reaching the eligibility

requirements.  The court finds that Casey became informed of the reservation of rights clause when it was read to him during his 1992 orientation meeting and it was contained in the handbook given him in 1992 and the Benefits Plan provided to him in 2004. The court, accordingly, ORDERS that Casey's breach of fiduciary duty claim be, and it hereby is, dismissed.

## Connie Z. Gilbert

Connie Z. Gilbert did not detrimentally rely on any representations Terry Mason made during her orientation meeting comparing UMWA benefits to CONSOL's benefits.  Though she testified that she did "rely" on Mason's representations, she never explained any actions she took in reliance thereon.  Tr. at 210.  Nor did she detrimentally rely on representations made to her during union-awareness meetings or during her husband's 2006 retirement seminar.

Gilbert was not eligible for retiree benefits at the time of her orientation in 2005.  From August 1, 2004 until some point in 2007, employees who were hired or rehired after August 1, 2004 were not eligible for participation in the retiree welfare benefits.  Defs.' Ex. 8; Tr. at 239-40, 909.  Given Gilbert was rehired and attended her orientation in June 2005, she was not eligible for the plan, and would not then have relied on representations about benefits.  See Tr. at 239-40.

Likewise, Gilbert was not a plan participant when she attended her husband's retirement seminar in 2006, and she may not have been a plan participant during some or all of the union awareness meetings, as well.

The conclusion that she did not detrimentally rely on representations made in union-awareness meetings or her husband's 2006 retirement seminar is supported by the fact that Gilbert was aware of the reservation of rights clause in the CONSOL Energy Buchanan Mine Employee Handbook at least as early as 2010. TR. at 250-51 Defs.' Ex. 9. Despite having then read that reservation of rights clause, Gilbert exhibited no change in conduct in the four years between 2010 and her retirement in 2014, such as looking for new employment or making alternate medical insurance plans.

The court, accordingly, ORDERS that Gilbert's breach of fiduciary duty claim be, and it hereby is, dismissed.

<u>Terry Prater</u>

Terry Prater relied on the material misrepresentation made to him by Craig Campbell and Jack Richardson during his initial interview that if he attained 10 years of service and reached 55 years of age, he would have medical, prescription drugs, dental, vision, and life insurance coverage for the rest

of his life.  Tr. 163.  The fact that he would have what he believed to be lifetime medical benefits was an important consideration in his taking employment with CONSOL in 2000.  Tr. at 164-65.  At the time of the interview, Prater was unaware that the company had reserved the right to terminate medical benefits ant the likelihood that the benefits could be terminated in the future.

Prater continued to rely on the same misrepresentation about lifetime benefits made during his orientation seminar. Moreover, Prater relied on Campbell's representation that employees "don't have to worry about" the reservation of rights clause contained in a film, as it was merely "attorney's language."  Tr. at 167, 179-80.  This was the only context in which Prater encountered the reservation of rights clause and he was reasonable in placing trust in the HR manager's representation that he should not worry about the reservation of rights clause.  As Prater explained, he "whole-heartedly" believed Campbell's representations about benefits and that as he aged, the provision of lifetime benefits "mean[t] a lot." Tr. at 167.

Campbell continually made the same material misrepresentation throughout the first eleven years of Prater's career, that employees who met the eligibility requirements

would have their retirement benefits for the rest of their lives
and, once they met those requirements, they "never had nothing
to worry about" regarding benefits and were "locked in."  Tr. at
203.  Given the importance that Prater placed on his retirement
benefits, the court concludes that he continued his employment
with CONSOL on the basis of these misrepresentations to his
detriment.  Prater has proven his breach of fiduciary duty claim
by a preponderance of the evidence.

## Clarence Bright

Clarence Bright trusted the statements made during the
2008 orientation that he would have retiree welfare benefits for
life once he had ten years of service and reached age 55, and he
began planning his retirement with those benefits in mind.  He
was told something similar at other meetings but never advised
at these meetings of CONSOL's reservation of rights which
appeared in written materials received by him that he did not
read.  CONSOL set the stage for Bright's belief that he would
have those benefits for life by not advising at those meetings
of its right to terminate at any time.  When he retired in May
2014, he kept his retiree benefits as he had planned, only to
have them curtailed and then completely terminated by CONSOL.

Inasmuch as Bright detrimentally relied on the
material representations made by CONSOL's HR managers that he

would have retiree welfare benefits for life and planned accordingly only to have those benefits terminated, the court finds by a preponderance of the evidence that Bright has proven his breach of fiduciary duty claim.

<u>Benjamin Fitzwater</u>

While Fitzwater was advised by HR managers that CONSOL would provide him retiree welfare benefits in exchange for a premium once he attained 10 years of service and age 55, and failed to tell him that CONSOL was retaining the right to terminate those same benefits, Fitzwater received a plethora of documents from CONSOL that contained and informed him of the reservation of rights provision.

It is evident that Fitzwater did not detrimentally rely on the foregoing representations of HR managers in that he voluntarily chose to retire after a year and a half layoff, receive a pension from CONSOL and UMWA, suspend his CONSOL retiree welfare benefits coverage except for life insurance which he effectively abandoned by not arranging to pay the necessary premium, and switch his coverage to the UMWA benefits program that he knew did not contain dental but which he regarded as far better than that of CONSOL.

It was only after retiring and making the switch to UMWA coverage that Fitzwater learned that CONSOL was terminating retiree welfare benefits five years later in December 2019, followed by the announcement that the termination would occur as of December 2015.

The court, accordingly, ORDERS that Fitzwater's breach of fiduciary duty claim be, and it hereby is, dismissed.

iii.  Statute of Limitations

ERISA provides three potential statutory time-bars for breach of fiduciary duty.  29 U.S.C. § 1113.  The first period begins when the alleged breach occurs and runs for six years of "the date of the last action which constituted a part of the breach or violation." [1]  Intel Corp. Inv. Policy Comm. v. Sulyma, 140 S. Ct. 768, 774 (2020); see § 1113(1).  The second statutory period "accelerates the filing deadline," and begins when the plaintiff gains "actual knowledge" of the breach.  Sulyma, 140 S. Ct. at 774.  Under § 1113(2), suit must be filed within three years of "the earliest date on which the plaintiff had actual

---

[1] The Supreme Court has clarified that the six-year period under §1113(1) is a "statute of repose," meaning it is an absolute bar to exposure to liability after the period has run, not subject to equitable tolling, though it is of course subject to statutory exception.  California Public Employees Retirement System v. ANZ Securities, Inc., 137 S. Ct. 2042 (2017).

knowledge of the breach or violation." Id. Actual knowledge "requires more than evidence of disclosure alone" and "the plaintiff must in fact have become aware of that information." Id. at 777.

"The third period, which applies 'in the case of fraud or concealment,' begins when the plaintiff discovers the alleged breach." Id. (quoting 29 U.S.C. § 1113). Under this exception, suit must be filed within six years of the plaintiff discovering the breach giving rise to the suit. Id. at 774; 776.

In determining the relevant trigger date for the time-bar, the court notes that the breaches of fiduciary duty occurred when CONSOL misrepresented benefits plans, not when the plan was terminated. The date of the last action constituting a breach of fiduciary duty as to Jack was the misrepresentation made to him at the retirement seminar prior to his December 2009 retirement that he would continue receiving benefits for the rest of his life. Jack was not a plaintiff in this case until March 1, 2018, over eight years after the last breach of fiduciary duty as to him by CONSOL. ECF No. 103. Thus, his fiduciary duty claim is time-barred unless the fraud or concealment exception applies.

Prater, who began working in October of 2000 was told during cookouts throughout his first eleven years at Jones Fork

70

that he would receive benefits for life, meaning the final
breach of fiduciary duty occurred at some point in late 2011,
though it is unclear exactly when.  Since Prater became a
plaintiff on April 24, 2017, his claim survives the first time-
bar.

Prater did not have actual knowledge that CONSOL could
terminate his retirement benefits until September 30, 2014, when
Gerald Kowzan announced to employees at Jones Fork that they
would not receive retirement benefits if they retired on or
after October 1, 2014.  See Browning v. Tiger's Eye Benefits
Consulting, 313 Fed.Appx. 656, 661 (4th Cir. 2009) ("[T]here
cannot be actual knowledge of a violation for purposes of the
limitation period unless a plaintiff knows the essential facts
of the transaction or conduct constituting the violation")
(citations omitted)).  This is the earliest instance defendants
have demonstrated Prater was actually aware that the
representations that he did not have to worry about the
reservation of rights clause or that he would have benefits for
life was in fact a misrepresentation.  Because he filed suit
prior to October 1, 2017, his claim is not time-barred.

Similarly, Bright was told at a retirement seminar in
2011 or 2012 of lifetime retirement benefits which he began
receiving in May 2014 only to learn in the Fall of 2014 that

those benefits were being curtailed.  Because he filed suit on October 17, 2016, his claim is not time-barred.

Jack gained actual knowledge of the breach of fiduciary duty when he received and read the letter from CONSOL in Fall of 2014, containing the reservation of rights clause and stating that plan participants would have their benefits terminated on December 31, 2019.  Because he did not file his claim in this case until March 1, 2018, his breach of fiduciary duty claim is barred by the three-year accelerated statute of limitations provision as well, unless the "fraud or concealment" exception applied.

The Fourth Circuit has recognized that the "fraud or concealment" language in the statute refers, at a minimum, to the fraudulent concealment doctrine.[2]  <u>Browning v. Tiger's Eye Benefits Consulting</u>, 313 Fed. Appx. 656, 663 (4th Cir. 2009).  Jack, as plaintiff, has the burden of establishing that the time-bars should be tolled by fraudulent concealment.  <u>See,</u>

---

[2] The Fourth Circuit also recognized that the majority view, shared by the First, Third, Seventh, Eighth, Ninth, and D.C. Circuits interpret the language to be synonymous with the fraudulent concealment doctrine.  <u>Id.</u> at n.4.  The court declined to address whether it agreed with the minority view held by the Second Circuit that the doctrine also encompassed fraud.  <u>Id.</u>

e.g., **Supermarket of Marlinton v. Meadow Gold Dairies, Inc.**, 71
F.3d 119, 122 (4th Cir. 1995).

Under the fraudulent concealment doctrine, the
plaintiff must show, "(1) that defendants engaged in a course of
conduct designed to conceal evidence of their alleged wrongdoing
and that (2) [the plaintiffs] were not on actual or constructive
notice of that evidence, despite (3) their exercise of
diligence."  **Id.** (quoting **Larson v. Northrop Corp.**, 21 F.3d
1164, 1172 (D.C.Cir.1994)).  As to the first element,
"regardless of whether the acts to conceal the breach occur in
the course of the conduct that constitutes the underlying breach
or independent of and subsequent to the breach, "[t]here must be
actual concealment — i.e., 'some trick or contrivance intended
to exclude suspicion and prevent inquiry.'"  **Larson**, 21 F.3d at
1173 (quoting **Martin v. Consultants & Administrators, Inc.**, 966
F.2d 1078, 1095 (7th Cir. 1992)).

The course of conduct taken by CONSOL in relation to
Jack falls short of a plan "designed to conceal evidence."
CONSOL may have intended to induce Jack to take up and maintain
employment at Enlow Fork through its misrepresentations but
there is no evidence that CONSOL or any of its agents intended,
through misrepresentations or otherwise, to prevent Jack from
learning the fact that CONSOL had reserved the right to

terminate benefits and that it could exercise that right in the future.  Rather, Jack received a booklet so stating at his orientation and thereafter.  Therefore, the "fraud or concealment" exception does not apply, and Jack's claim is time-barred by both 29 U.S.C. § 1113 (1) and (2).

The court, accordingly, ORDERS that Jack's breach of fiduciary duty claim be, and it hereby is, dismissed with prejudice.

### 2. Failure to Provide Summary Plan Descriptions

Under 29 U.S.C § 1021, a plan administrator has a duty to distribute a summary plan description ("SPD") to participants and beneficiaries of an ERISA plan.  The SPD must be distributed to plan participants within the required 90-day or 120-day period.  29 U.S.C. § 1024(b)(1).  The plaintiffs' only contention on this count is that CONSOL failed to distribute an SPD after the separation of the retiree welfare benefits plan from the active employee benefits plan on January 1, 2011.  See Tr. at 1238.  Plaintiffs must show that they suffered harm from CONSOL's alleged failure to comply with ERISA's statutory disclosure requirements.  Knepper v. Volvo Grp. N.A., 2019 WL 4750337, at *18 (D. Md. Sept. 27, 2019); see also Ellis v. Metro. Life Ins. Co., 126 F.3d 228, 238 (4th Cir. 1997); Pierce v. Security Tr. Life Ins. Co., 979 F.2d 23, 30 (4th Cir. 1992).

Plaintiffs have not demonstrated by a preponderance of the evidence that CONSOL failed to distribute summary plan descriptions in the 90-day or 120-day time period following the plan splitting.  While a number of plaintiffs testified that they did not recall receiving an SPD in 2011, the court is unable to conclude that the SPDs were not in fact distributed in a timely fashion.

Moreover, plaintiffs have not demonstrated any harm that they suffered resulting from the alleged failure to distribute an SPD following the plans splitting.  To the contrary, the splitting of the plan in 2011 did not involve material changes in the delivery of benefits.  Tr. at 881.

The court, accordingly, ORDERS that the failure to distribute the SPD claim be, and it hereby is, dismissed with prejudice as to all plaintiffs.

### III. FINDINGS ON DAMAGES AND INJUNCTIVE RELIEF

Having found for Prater and Bright on their breach of fiduciary duty claims, the court additionally finds that they have been damaged by CONSOL's misrepresentations.  As set forth below, the court finds an award of reformation of the terms of the benefits plan in accordance with Prater's and Bright's reasonable expectations to be appropriate.

75

A. Reformation

Section 502(a)(3) of ERISA provides that "[a] civil action may be brought by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan." 29 U.S.C. § 1132(a)(3).  The Supreme Court has explained that the term "appropriate equitable relief" in § 502(a)(3) refers to "those categories of relief that, traditionally speaking (i.e., prior to the merger of law and equity), were typically available in equity." Cigna Corp. v. Amara, 563 U.S. 421, 439 (2011) (internal quotation marks omitted).  Reformation of contracts or trust documents were among the traditional powers of the equity courts and reformation of an ERISA plan falls within the scope of "appropriate equitable relief" under §502(a)(3).  Id. at 440.

The concept of fraud at equity evades simple definition but generally consists of "obtaining an undue advantage by means of some act or omission which is unconscientious or a violation of good faith." Id. (quoting 3 John N. Pomeroy, A Treatise on Equity Jurisprudence § 873 at 420–21 (5th ed.1941)).  Undoubtedly, the misrepresentations made

to Prater and Bright meet this standard.  CONSOL gained the undue advantage of procuring ongoing employment of each Prater and Bright, as well as their participation in the benefits plan devised by CONSOL through misrepresentations which were both in bad faith and unconscientious.

"Proving mistake for purposes of granting reformation requires a showing that a party entered a contract "'in ignorance or mistake of facts material to its operation.'"  Id. (quoting Ivinson v. Hutton, 98 U.S. 79, 82, (1878)).  The court's findings establish that each Prater and Bright mistakenly believed, and each detrimentally relied upon CONSOL's HR manager assuring each that, his retiree benefits plan would cover him for life, without being subject to a reservation of rights clause.  As described above, this mistake was caused by the misrepresentations of CONSOL, in violation of the Company's fiduciary obligations under ERISA.

Accordingly, the court hereby ORDERS that each Prater's and Bright's retiree welfare benefits plan be reformed to provide the benefits as each reasonably expected, that is medical, prescription drug, vision, dental, and life insurance for the remainder of life and orders and enjoins CONSOL to enforce the plan as thus reformed.  The court hereby notes that

the injunction is likely to be stayed upon motion to allow the parties to pursue an appeal if they so choose.

### B. Surcharge

Plaintiffs contend that they are entitled to a surcharge to "return [] that portion of the premiums that CONSOL allocated to the life insurance benefit that each retiree lost." Pls.' Br. at 22.  Plaintiffs have cited no evidence which suggests how much Prater or Bright paid or lost in life insurance premiums.  The request for surcharge of life insurance premiums is denied.

### C. Disgorgement

Plaintiffs also argue that they are entitled to a proportionate share of CONSOL's gain from terminating the retiree welfare plan.  Pls.' Br. at 23.  In measuring CONSOL's gains from termination, plaintiffs rely on preliminary calculations of CONSOL's savings from terminating the plan, as evidenced in an email exchange from Salvatori.  See Tr. at 998; Pls.' Ex. 21.  Plaintiffs also rely on an abbreviated version of CONSOL's 2015 Form 10-K in calculating CONSOL's potential gain. See Pls.' Ex. 28.  The numbers in the Form 10-K do not reflect CONSOL's actual economic gain, but rather arise out of technical rules of accounting related to recognizing net actuarial loss.

Tr. at 1044.  Neither exhibit cited offers a proper basis for arriving at the profit CONSOL enjoyed by misrepresenting retiree benefits to employees or by terminating those benefits.

Moreover, even if plaintiffs had satisfactorily demonstrated CONSOL's actual profits from terminating retiree welfare benefits overall, it would be inequitable to apply plaintiffs' imprecise formulation.  By simply dividing pro rata the overall profit CONSOL enjoyed by the number of employees affected, there would be a significant risk of a substantial windfall on behalf of Prater and Bright.  See Pender v. Bank of America Corp., 736 Fed.Appx. 359, 364-65 (4th Cir. 2018).  In crafting an equitable remedy for an individual plaintiff, the court would look to the undue benefits to defendants from their breach of fiduciary duty to that particular plaintiff.  Plaintiffs have not made an evidentiary showing as to the actual economic benefit enjoyed by CONSOL by misrepresenting benefits to Prater and Bright.  Plaintiffs' request for disgorgement is denied.

The Clerk is requested to forward copies of this memorandum opinion and order to all counsel of record and to any unrepresented parties.

ENTER: September 30, 2024

John T. Copenhaver, Jr.
Senior United States District Judge